[L.A. No. 32105. Jan. 2, 1987.]

DOLORES LANGFORD et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
DARYL GATES, as Chief of Police, etc., et al., Real Parties in
Interest.

22

**COUNSEL**

Joan Howarth, Pete R. Navarro, Mark D. Rosenbaum and Paul Hoffman for Petitioners.

No appearance for Respondent.

James K. Hahn, City Attorney, Lewis N. Unger, Assistant City Attorney, Donna B. Weisz and Jack L. Brown, Deputy City Attorneys, for Real Parties in Interest.

## OPINION

**MOSK, J.**—We granted review in this case to determine whether the Los Angeles Police Department (LAPD) should be enjoined from using a motorized battering ram and pyrotechnic explosive devices known as "flashbangs" to execute searches of so-called "rock houses," which are specially fortified residential dwellings where crystallized "rock" cocaine is made and sold. As will appear, we are persuaded that the unregulated use of the motorized battering ram, but not the flashbangs, poses a significant and unusual threat to property and public safety that may, unless subject to judicial scrutiny, contravene the proscription against unreasonable searches contained in the Fourth Amendment to the United States Constitution and article I, section 13, of the California Constitution.

In light of the deliberate, often prolonged, planning that the LAPD undertakes before it deploys the device, prior judicial review of its proposed use of the ram against suspected rock houses is unlikely to obstruct effective law enforcement. Therefore we conclude that a writ of mandate should issue directing the trial court to enjoin deployment of the ram to execute search or arrest warrants unless a magistrate authorizes its use, and unless exigent circumstances arise at the time of entry. On the other hand, since we are not convinced that the flashbangs are inherently dangerous, we rely on the discretion of law enforcement agencies to determine when and under what circumstances they are to be used.

Petitioners (hereinafter plaintiffs) are taxpayers and individuals who occupied a suburban Los Angeles residence on the evening of February 6, 1985, when it was forcibly entered by LAPD officers using a motorized battering ram to penetrate a wall of the house and flashbangs to divert and disarm its occupants. The police were executing a search warrant issued several days earlier after an informant made a controlled purchase of rock cocaine through a metal slot in the front door.

The LAPD had engaged the assistance of Special Weapons and Tactics Team members to break into the house, after concluding that iron bars over its windows and an electronically controlled locked "cage" at the front

entrance precluded rapid entry by less dramatic means. The police chief invited the news media to witness the first use of the "V-100," an armored personnel carrier equipped with a battering ram. In front of television cameras and without prior warning to the occupants—other than a bystander's shouts of "Police!"—the officers drove the ram through the exterior wall of the house and into a family room; simultaneously, police detonated flashbangs in the room and entered in full force. As it turned out, the house was occupied by two unarmed women and their three young children; the officers recovered no weapons and only trace amounts of cocaine along with alleged drug paraphernalia.

Plaintiffs brought an action for damages and declaratory and injunctive relief on federal and state grounds, contending that the LAPD's practice of using the motorized battering ram and flashbangs against residences constitutes inherently excessive force which is unreasonable per se under the Fourth, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution, and article I, sections 1, 7, 13, and 15 of the California Constitution. Real parties in interest (hereinafter defendants) removed the action to federal court, which remanded to state courts all claims with the exception of a damage action under a federal civil rights statute. By then—in May 1985—the LAPD had used the devices in a total of four searches of suspected rock houses.

Plaintiffs applied for a preliminary injunction, urging that the ram and flashbangs be prohibited in searches of occupied dwellings. At the hearing, however, they stipulated that they did not seek to restrict LAPD deployment of either device "if such use reasonably appears necessary to stop an ongoing threat of immediate serious injury or death" such as in a terrorist or hostage scenario.

Defendants responded that the use of the devices was entirely justified by the unique problems for law enforcement posed by the fortress-like rock houses proliferating in residential areas. Rock houses are typically equipped with steel bars on exterior windows and are entered by way of multiple steel doors: a mesh entry door provides access to a barred "cage," and a second steel-reinforced door may lead from there to the interior of the house or to a third door that is the actual front door. Officers can usually only surmise the extent of interior hardware, which may include steel bars and mesh over windows on the inside of the house, multiple deadbolts on interior and exterior doors, and thick boards bolted across entries. Even approaching such operations may be dangerous to law enforcement officers as rock houses may monitor outside activity by means of cameras and other electronic surveillance devices.

Defendants averred that the fortifications of the house in question appeared more elaborate than those installed on other houses in the neighborhood to avert burglaries—although they conceded their preliminary investigation was hampered because their informant could not see into the interior of the house. The informant's purchase of cocaine confirmed LAPD suspicions that it was a rock house: the informant was "buzzed" into the front cage, the exterior door of which was locked after entry, he exchanged cash for rock cocaine through the door slot, and he was released after being "buzzed" out. Furthermore, raids against two similarly fortified houses owned by the same individual suspected of owning the target house had yielded cocaine and weapons, and neither had contained clothing or furnishings indicating the presence of regular occupants.

On the basis of the 2 previous raids and of the statistically high incidence of weapons in rock houses generally—between October 1984 and February 1985, police seized 207 guns in 269 operations against such houses—the LAPD anticipated armed resistance. Moreover, because of the elaborate ironworks of the exterior entrances, they concluded it would be impossible to enter by conventional methods before evidence was destroyed.

Defendants went on to describe the engines of war that are the subject of the present action. Each V-100 armored personnel carrier is mounted with a 14-foot horizontal steel pole capped with a rectangular steel plate. Driven at approximately five miles an hour against the exterior wall of a building and then withdrawn, it creates a hole large enough for several officers to enter simultaneously. Although approved by the department for use in nine raids, the motorized rams have actually been deployed only four times, with no physical injuries to persons or major damage to buildings, either stucco or brick. Plaintiffs contended this apparent safety record is misleading, warning that according to their experts structural damage could be catastrophic, resulting in serious injuries through flying debris, collapsed ceilings, and even explosion and fire.

Defendants asserted that flashbangs have proved particularly effective in safely disarming dangerous individuals, by temporarily blinding them with a brilliant flash of light and confusing them with artillery-like sounds. Since they were introduced into the police arsenal in 1982, flashbangs have been approved by the department for use 38 times, on 25 occasions in 1985 alone. Defendants introduced expert testimony showing that flashbangs are designed exclusively to produce dramatic pyrotechnics, not to injure, and should cause only minor skin burns at worst. This has proved true, with a single tragic exception: a woman was killed in December 1984 when a flashbang exploded between her back and a wall. The LAPD accounts the death a "freak" accident, but has taken measures to preclude a similar

mishap by reducing by half the explosive power of the device and requiring that officers detonate them only after they have seen fully into a target area. No other injuries have been reported.

Defendants maintained that although dangerous, the devices do not constitute deadlier force than many of the conventional tools—including tear gas, hand-held battering devices, and explosives applied directly to deadbolts—long used for forcible entry. They argued that a blanket prohibition against a particular device, subject to magistrate approval, is without precedent. Moreover, such review would duplicate the careful prior screening already conducted by police administrative panels, which approve deployment only when either device is the safest means of accomplishing a speedy forced entry. Finally, they insisted that injunctive relief is unavailable: courts may review the LAPD's use of any particular weaponry only retrospectively, on a case-by-case basis.

The trial court agreed with defendants. It denied plaintiffs' motion for injunctive relief concluding that although they might eventually establish that the motorized battering rams and flashbangs are unreasonable per se, they had submitted insufficient data to demonstrate a current policy of misuse by the LAPD. It observed that short of banning the devices outright, it lacked authority to regulate or condition their use except by requiring prior judicial authorization for nighttime service.

Although it denied the motion on the ground that "it's a mistake for the court to interfere in the first instance," the court expressed misgivings about use of the motorized battering ram without judicial oversight: "Waking people after 10 o'clock you have to get the magistrate's permission. Knocking a large hole in a wall of a residence where people might be sleeping, you don't have to get a magistrate's permission." It "question[ed] the wisdom" of LAPD policy, urging "The judgment having been made to use the ram, why can't you tell the magistrate on an honest basis that this is a situation that calls for the battering ram and we are seriously contemplating it?"

Plaintiffs petitioned the Court of Appeal for a writ of mandate to compel the trial court to grant preliminary injunctive relief. The Court of Appeal summarily denied the petition on the ground that plaintiffs have an adequate remedy by appeal. We granted plaintiffs' petition for review and issued an alternative writ of mandate. In so doing we necessarily determined that plaintiffs lack a "plain, speedy, and adequate remedy in the ordinary course of law." (Code Civ. Proc., § 1086; see *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 205 [211 Cal.Rptr. 398, 695 P.2d 695].)

A trial court's decision to deny provisional relief is discretionary and will be upheld if it is supported by sufficient evidence, even if there is evidence that could support a contrary conclusion. (See *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].) A writ of mandate will issue to control the exercise of judicial discretion only when a court has acted capriciously or "where, under the facts, that discretion can be exercised in only one way." (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]; *Robbins* v. *Superior Court, supra,* 38 Cal.3d 199, 205.)

In deciding whether a preliminary injunction should issue, the trial court must evaluate two interrelated factors: "The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]; accord, *Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) Our inquiry into whether the court abused its discretion in the present case is therefore two-fold: do plaintiffs demonstrate they are likely to prevail on the merits of their challenge to the LAPD's current practice of using motorized battering rams and flashbangs? And are they likely to suffer irreparable harm to their interests as individuals and as taxpayers if interim relief is withheld?

We conclude that plaintiffs fail to meet the foregoing requirements as to the flashbangs. We are not persuaded by their claim that flashbangs, like the ram, pose an unacceptable threat to property and person. At their present reduced explosive power, and under current LAPD guidelines requiring that officers detonate them only after they have seen fully into a targeted room, the flashbangs appear from the record to present a minimal risk of injury—certainly a lesser risk than the use of guns to disarm hostile suspects. Flashbangs have been used without incident under the modification and restrictions instituted by the LAPD in 1984 after a single fatal accident; in more than 25 cases since 1984, the flashbangs have aided the police while inflicting only momentary disorientation on suspects. Because use of the flashbangs may not, therefore, be accounted unreasonable, the court did not abuse its discretion in denying a preliminary injunction against their use.

The motorized battering ram, however, presents a more difficult problem. We first address the merits of plaintiffs' underlying claim that prior judicial authorization is required before officers use the battering ram, which is a destructive and dangerous means of forcible entry into an occupied dwelling.

Although defendants dispute the level of risk posed by the V-100 battering ram, they concede the potential danger from collapse of building walls and ceilings or through rupture of utility lines. Fire from damaged electrical wires or explosion from gas leaking from broken gas pipes could threaten the safety not only of occupants, but of entire neighborhoods. Because of the unprecedented risks to owners, occupants, and neighbors of suspected rock houses, therefore, routine deployment of the ram to enter dwellings must be considered presumptively unreasonable unless authorized in advance by a neutral magistrate, and unless exigent circumstances develop at the time of entry.

Defendants insist that short of an absolute ban on devices deemed unreasonable per se, judicial review of police tactics is limited to after-the-fact inquiry into whether the force used was excessive. We disagree. Although we have not previously imposed specific conditions on the use of any single weapon in the police arsenal, there is authority for requiring magistrate approval for especially dangerous and intrusive law enforcement practices. Penal Code section 1533, for example, permits nighttime service of an arrest or search warrant only on a showing of good cause and at a magistrate's discretion. Similarly, this court held that certain intrusive body searches without special warrant are presumed unreasonable even when performed incident to a valid arrest and on probable cause. (*People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123].) Common to both limitations is the concern that the sensitive evaluation of unusual and dangerous intrusions affecting privacy and security interests of targeted persons should not be left exclusively to the "officer engaged in the often competitive enterprise of ferreting out crime." (*Johnson* v. *United States* (1948) 333 U.S. 10, 13-114 [92 L.Ed.2d 436, 440, 68 S.Ct. 367].) Although searches of rock houses are directed against residences and not persons, the risk of incidental injury to human beings within the residences is reasonably foreseeable.

Defendants insist that the Fourth Amendment imposes no requirement of judicial oversight: "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.' " (Fn. omitted.) (*Dalia* v. *United States* (1978) 441 U.S. 238, 257 [60 L.Ed.2d 177, 192, 99 S.Ct. 1682].) Their reliance on *Dalia* is misplaced.

First, *Dalia* is distinguishable on its facts. It involved a warrant authorizing a telephone wiretap under 18 United States Code section 2518, and addressed the limited question of whether a separate warrant was required before federal officers could enter a business office covertly to install the device. The court found such authorization implicit in the original warrant:

in virtually every wiretap, surreptitious entry is necessary and a separate warrant would prove an "empty formalism." (*Id.,* at p. 258 [60 L.Ed.2d at p. 193].) Second, covert entry involves minimal destruction of property and danger to persons; as the court noted, it is generally the safest—and often the only—means of executing a legal wiretap. On those grounds, the court held that covert entry is a reasonable means of executing a warrant for electronic eavesdropping.

Neither basis for the holding in *Dalia* applies here. Authority to make a forced entry by means of a powerful armed vehicle that smashes blindly through the walls of a residence is by no means implicit in a routine warrant to search for contraband. More important, the motorized battering ram is usually not the least destructive, safest, or only method of conducting such a search. Rather, it is so destructive that its use against residences generally infringes on occupants' and owners' rights to be secure against unreasonable searches and seizures.

Defendants insist we must defer in the first instance to police discretion. We do, in fact, yield to police discretion in the first instance as to the desirability of using mechanical force. But before such force is actually employed, the impartial judgment of a judicial officer must be interposed between citizens and the police. Thus the LAPD's use of the V-100 battering ram must depend on prior magistrate approval.

Defendants next contend that in any case before-the-fact review is precluded by *Parsley* v. *Superior Court* (1973) 9 Cal.3d 934 [109 Cal.Rptr. 563, 513 P.2d 611], because the LAPD uses the motorized battering ram only under exigent circumstances that cannot be assessed in advance. In fact, however, the LAPD itself makes just such a prior assessment under its current procedures: it approves use of the ram in specific cases not because an exigent situation is in progress, but because it strongly suspects that when the officers arrive at the scene they will be met with resistance to a legal search.

In *Parsley* we held that the magistrate was without power to authorize noncompliance with the announcement requirement of Penal Code section 1531, which provides that an officer may break open any part of a house to execute a warrant "if, after notice of his authority and purpose, he is refused admittance." We reasoned that failure to give notice could not be justified by the warrant provision alone: "the key to permissible unannounced entry is the knowledge of exigent circumstances possessed by police officers at the time of entry. Thus, from the viewpoint of a court reviewing justification for an unannounced entry after the fact, a warrant authorizing such action adds nothing." (*Id.,* at p. 940.) On the other hand,

such a warrant would improperly allow the magistrate's decision to substitute for the immediate determination of the situation officers face at the moment of entry. (*Ibid.*)

The same objections, however, do not apply to the type of prior authorization proposed here. The magistrate would not be asked to presume that the police will face an exigency at a rock house, nor would he require the LAPD's actual deployment of the motorized battering ram: any use would still involve the threshold judgment of officers at the time of the search that an exigent situation had in fact developed—i.e., that evidence was in the process of being destroyed or that resistance to the search posed a serious danger of injury to police justifying deployment of the battering ram. It would not be sufficient to conclude that the objects named in the search warrant are by nature amenable to ready destruction or that occupants of rock houses are generally disposed to resist searches; a specific showing of exigency is needed. (See *People* v. *Dumas* (1973) 9 Cal.3d 871, 878-879 [109 Cal.Rptr. 304, 512 P.2d 1208]; *People* v. *Gastelo* (1967) 67 Cal.2d 586, 588-589 [63 Cal.Rptr. 10, 432 P.2d 706]; *People* v. *Vollheim* (1978) 87 Cal.App.3d 538, 543 [150 Cal.Rptr. 837].)

The magistrate should decide only whether the motorized battering ram could be used with relative safety against a particular building, if the need arises during execution of a search or arrest warrant. The LAPD declares that it already conducts its own screening of the need for the device and deploys it only as an extreme measure and only if officers at the scene remain convinced it is necessary. Magistrate review would simply place that screening, and the decision whether use of the ram could be justified, in the hands of a neutral and independent judicial officer.

In *Scott* we established a balancing test that we now adapt to the present case. (See 21 Cal.3d at pp. 293-294.) ■ Before authorizing potential use of the battering ram, the magistrate finding probable cause for the underlying search must apply an additional balancing test to determine whether use of the device is appropriate. Factors that must be considered include the reliability of the ram under the specific circumstances as a rapid and safe means of entry, the seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction, the strength of law enforcement suspicions that evidence of the crime will be destroyed, the importance of the evidence sought, and the possibility that the evidence could be recovered by alternative means less violative of Fourth Amendment protection. Alternative means include conventional methods of entry and such procedures as abatement against the owner of the suspected rock house or criminal charges under Health and Safety Code sections 11366 and 11366.5, which are especially tailored to combat the proliferation of fortified

houses.[1] All these considerations must, in turn, be balanced against the severity of the proposed intrusion: the likelihood of injury to innocent third parties as well as to occupants and police officers, and of extreme property damage to the target house and neighboring structures.

 We conclude therefore that the motorized battering ram may be used in executing searches or arrests only after the LAPD satisfies three preliminary requirements: i.e., it (1) obtains a warrant upon probable cause, (2) receives prior authorization to use the ram from a magistrate, and (3) at the time of entry determines there are exigent circumstances amounting to an immediate threat of injury to officers executing the warrant or reasonable grounds to suspect that evidence is being destroyed.

 Having concluded that plaintiffs are likely to prevail on the merits, we must now determine whether the balance of interim harm favors plaintiffs.

Plaintiffs are likely to suffer irreparable injury if the LAPD continues to deploy the motorized battering ram without prior judicial overview. There is danger of injury to persons and to property in any use of the device. Moreover, plaintiffs may claim injury as taxpayers for the expenditure of funds by the LAPD to execute searches by unlawful methods. (See *Arrieta* v. *Mahon* (1982) 31 Cal.3d 381, 387 [182 Cal.Rptr. 770, 644 P.2d 1249]; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 269 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)

 Defendants, on the other hand, cannot claim they will suffer comparable injury if they are enjoined from using the ram without prior judicial authorization. In light of their already extensive administrative review of proposed uses, the additional requirement that the magistrate issuing the search warrant also authorize possible use of the ram should be a minimal burden. The ability of law enforcement to respond to rapidly changing circumstances at the scene of the search will remain unimpaired.

---

[1] Health and Safety Code section 11366 provides: "Every person who opens or maintains any place for the purpose of unlawfully selling, giving away, or using any controlled substance . . . which is a narcotic drug classified in Schedule III, IV, or V, shall be punished by imprisonment in the county jail for a period of not more than one year or the state prison."

Section 11366.5, subdivision (b) states: "Any person who has under his or her management or control any building, room, space, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, who knowingly allows the building, room, space, or enclosure to be fortified to suppress law enforcement entry in order to further the sale of any amount of cocaine, heroin, or phencyclidine and who obtains excessive profit from the use of the building, room, space, or enclosure shall be punished by imprisonment in the state prison for two, three, or four years."

For the foregoing reasons, we hold that the trial court abused its discretion in denying plaintiffs' motion for a preliminary injunction. Let a peremptory writ of mandate issue directing respondent court to set aside its order of June 18, 1985, denying plaintiffs' motion for a preliminary injunction in Langford et al. v. Gates et al., and to enter an order enjoining the use by defendants of their motorized battering ram unless they obtain prior judicial authorization to do so in a search or arrest warrant, and unless exigent circumstances arise at the time of entry.

Broussard, J., Grodin, J., and Reynoso, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I write separately to express my views on the use by the police of a weapon of war in the neighborhoods of our citizens.

The facts warrant in-depth review because they highlight just how dangerous and unnecessary use of the "motorized battering ram" is in executing search or arrest warrants, even where the police confront specially fortified residences. They provide the basis for understanding why other police departments spurn its use, likening it to the use of an Uzi to shoot an illegally parked driver in the leg so he will be unable to escape getting a ticket. (Klein, *Rock Houses: Police Ram Opens Door to Debate,* L.A. Times (June 4, 1985) Home Ed., Metro Section, at p. 1.)

Turning to the record, there is basic agreement as to the following:

(1) The "motorized battering ram" is actually a military vehicle—a V-100 armored personnel carrier or tank—that has been specially equipped with a 14-foot horizontal steel battering ram capped with a rectangular steel plate.[1]

(2) When used to gain entry to a house, the V-100 is driven at approximately five miles per hour toward an exterior wall. The ram is attached to the front of the vehicle. Once it hits and punches through the wall, the driver puts the vehicle in reverse and, as the ram is being withdrawn, the

---

[1] One newspaper report observes that the government uses the V-100 "to guard nuclear power plants and warhead factories." (Klein, *Rock Houses: Police Ram Opens Door to Debate,* L.A. Times, *supra,* at p. 1.) The report describes the vehicles as "look[ing] like little tanks with tires. They weigh 6.4 tons, [can] travel 62 miles an hour, can withstand small-arms fire and can climb a 30% grade." (*Ibid.*)

Although the Los Angeles Police Department (LAPD) prefers to use the euphemism "motorized battering ram" to refer to its specially equipped V-100, the department somewhat grudgingly admits that it would be "perceived to be a tank," which is what plaintiffs prefer to call it. Hereafter, the ram shall be referred to simply as the V-100, even though the "tank" description appears wholly accurate.

driver rakes it back and forth to create a hole approximately five feet in diameter through which the police may enter without having to crawl. These maneuvers take approximately six seconds.

(3) The department's usual but not invariable practice is to announce over a public address system that the LAPD is present to serve a search warrant immediately prior to using the V-100 to gain entry to a house. Insofar as the record reveals, however, the police do not ordinarily wait even a few seconds to determine whether the occupants of the house are willing to permit entry.

(4) The V-100 causes substantial damage to the target house. The force of impact is such as to cause wall studs at the area of impact to be displaced and thrown forcefully into the interior of the house. In addition, the V-100 causes significant damage to walls and ceilings located at some distance from the point of impact.

(5) The parties dispute the level of risk posed by use of the V-100 to the overall integrity of the target house and to the surrounding neighborhood. All agree, however, that there is a potential danger of structural collapse and/or rupture of electrical and gas utility lines and that a serious fire or explosion which could threaten the safety not only of the occupants of the target house but also of the surrounding neighborhood could result. In addition, the police have no way of knowing in advance whether individuals are standing or sitting directly in front of the V-100's intended point of impact and so might be struck by the ram itself or injured by falling wall studs, flying bits of masonry, or broken glass from nearby windows.

(6) At the time of the hearing on the preliminary injunction, the LAPD had used the V-100 four times in executing search warrants."[2] The first time was on February 6, 1985, against the Langford's rented home at 13037 Louvre Street. The LAPD concedes that this home was "fortified" in exactly the same manner as the house at 13031 Louvre Street, which the police were able successfully to enter and search—*without use of the V-100*—in June of 1984, before the occupants could destroy the cocaine in their posses-

---

[2] Although the LAPD gave its officers authority to use the V-100 on five other occasions during 1985, they did not employ it because of "changed circumstances" encountered at the scene of execution of these search warrants.

There is no indication in the record as to the nature of these "changed circumstances." However, the Los Angeles Times reports that, in one instance, the officers found a side door open and were able simply to walk in, while in another the house was blocked off by cars, thus preventing use of the V-100. (Klein, *The Ram at Rest: These Are Quiet Times for the LAPD's 'Battering' Vehicle*, L.A. Times (Feb. 10, 1986) Home Ed., Metro Section, at p. 1.) The V-100 is also useless, of course, against "rock houses" located in multi-story buildings above ground level.

sion. The LAPD further concedes that the decision to request use of the V-100 against 13037 Louvre Street was based solely on the visible fortifications and on the fact that the house was owned by one Jeff Bryant.[3] The police had no evidence that there were any weapons at 13037 Louvre Street.[4]

(7) The V-100 was next used on February 13, 1985, against an even more "fortified" house located at 233 West 111th Street. The police again concede that they were able successfully to enter and search this very same building—without use of the V-100—in September of 1984. They further concede that the decision to request use of the V-100 on February 13th was based solely on the fact that the house was fortified and that, during the previous search, they had recovered two weapons.

(8) The third use of the V-100 occurred on March 22, 1985, against a house located at 11442 Wheeler Avenue. The police concede, yet again, that they were able successfully to enter and search this same house—without use of the V-100—two months earlier, before the occupants were able to destroy the cocaine in their possession. Moreover, although a weapon was recovered in the earlier raid, there is no indication in the record that any attempt was made by the then current occupants to use it against the officers who executed the warrant. Finally, the only visible change in the fortifications during the two-month interval between the first and second searches was the addition of a chain link fence around the front of the house.

(9) The fourth use of the V-100 took place on April 26, 1985, against a "rock house" located on the ground floor of a brick building located at 4066 South Central Avenue. Insofar as the record reveals, the police had not previously served a search warrant at this location. Before entering the premises on April 26th, they were aware of the full extent of the interior fortifications, which were substantial. They had also been told that a shooting had occurred in the house the week previous, knew that both the operator and two guards were present, and knew that at least the operator and possibly the guards were armed or had weapons nearby.

---

[3] Prior raids by coventional means on two other houses owned by Bryant—including 13031 Louvre Street—turned up weapons. The occupants of these houses did not, however, use these weapons to resist entry by the police. Moreover, the occupants were unsuccessful in their attempt to destroy the narcotics in their possession.

[4] Plaintiffs have repeatedly argued the fact no weapons were discovered in the course of the first three raids in which the ram was used as evidence that the LAPD's policies governing its use are constitutionally inadequate. However, it is well settled that "a search is not to be made legal by what it turns up. In law, it is good *or bad* when it starts and does not change character from its success [or failure]." (*United States* v. *Di Re* (1948) 332 U.S. 581, 595 [92 L.Ed. 210, 220, 68 S.Ct. 222].) Accordingly, paragraphs (6) through (9) summarize only those facts known to the LAPD at the time of entry on each of the four occasions on which the ram was used. The facts learned subsequent to entry are irrelevant.

(10) Although there is no direct evidence that use of the ram on this last occasion was wholly unnecessary, there is substantial circumstantial evidence which compels such conclusion. For example, during the four-month period from October 1984 to February 1985, members of the LAPD were able to enter and search 269 "rock houses" in which a total of 207 guns were seized—without use of the V-100 and apparently without injury to a single officer or the loss of a gram of evidence. Similarly, during the 3-day period from May 30 through June 1, 1985, LAPD officers entered and searched 13 (or 14) "rock houses" without resorting to use of the V-100 and without suffering injury, seizing approximately 10 weapons and 1000 grams of cocaine.[5]

(11) No one was physically injured during the four occasions on which the V-100 was used, although the three children present in the Langford's house when it was rammed were so terrified by the experience that they were still having nightmares about it at the time of the hearing on the preliminary injunction, i.e., some four months later.

## I.

I concur fully in the majority's conclusion that the LAPD's use of the V-100 may be regulated prospectively, through a carefully tailored injunction. The LAPD's contention that use of any particular weaponry may only be reviewed retrospectively on a case-by-case basis is frivolous.

First, it is well settled that "a pattern or practice of official conduct that is alleged to violate Fourth Amendment rights may be challenged by an aggrieved individual in a suit for declaratory or injunctive relief." (*Illinois* v. *Gates* (1983) 462 U.S. 213, 266, fn. 19 [76 L.Ed.2d 527, 566, 103 S.Ct. 2317, 2346] (conc. opn. of White, J.), citing *Zurcher* v. *Stanford Daily* (1978) 436 U.S. 547 [56 L.Ed.2d 525, 98 S.Ct. 1970] [action for declaratory relief under the Fourth Amendment]; accord, *Lankford* v. *Gelston* (4th Cir. 1966) 364 F.2d 197, 202 (en banc); *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222]; *Wirin* v. *Parker* (1957) 48 Cal.2d 890 [313 P.2d 844]; *Wirin* v. *Horrall* (1948) 85 Cal.App.2d 497, 504-505 [193 P.2d 470] [actions for injunctive relief under the Fourth Amendment].)[6]

---

[5] December 1983, two LAPD officers were seriously injured by gunfire during execution of a search warrant on a "rock house." The police admit, however, that in narcotics cases the danger of such armed resistance is not limited to raids on "rock houses," and there is no evidence in this record which suggests that officers have in fact encountered such resistance more frequently in raids on "rock houses" than in other raids.

[6] The only difference between federal and California law in this regard concerns the showing a party must make in order to establish that he or she is "an aggrieved individual" and so entitled to bring such an action. California's requirements are less stringent than those imposed by federal law. (Compare *Los Angeles* v. *Lyons* (1983) 461 U.S. 95 [75 L.Ed.2d 675, 103 S.Ct. 1660] with *White* v. *Davis, supra,* 13 Cal.3d at pp. 762-765.)

Contrary to the LAPD's assertion, injunctions have issued to control the future use of particular weaponry by the police. (See, e.g., *Wirin* v. *Parker, supra,* 48 Cal.2d 890 [affirming issuance of an injunction to prohibit use of concealed microphones in the surveillance of private residences absent a search warrant].)

Second, in cases retrospectively challenging police practices, the courts routinely announce categorical rules that not only resolve the question whether the police acted properly in the case before the court but also define the circumstances, if any, in which such practices may be used in the future. Though technically not injunctions, such rules obviously have precisely the same effect. (See, e.g., *Tennessee* v. *Garner* (1985) 471 U.S. 1 [85 L.Ed.2d 1, 105 S.Ct. 1694]; *Steagald* v. *United States* (1981) 451 U.S. 204 [68 L.Ed.2d 38, 101 S.Ct. 1642]; *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371]; *Delaware* v. *Prouse* (1979) 440 U.S. 648 [59 L.Ed.2d 660, 99 S.Ct. 1391].) Consider *Tennessee* v. *Garner, supra,* 471 U.S. 1. There, the Supreme Court confronted the issue whether police use of deadly force to apprehend a fleeing 15-year-old suspected felon violated the Fourth Amendment. The court concluded that it did and announced the rule that such force may be used only if the officer has probable cause to believe that the fleeing suspect poses a threat of serious physical harm, either to the officer or others. (*Id.,* at p. 11 [85 L.Ed.2d at p. 10].) The effect of that holding is to enjoin police across the nation from using deadly force to effectuate an arrest except in the circumstances sanctioned.

Thus, I must reject as frivolous the LAPD's contention that its use of the V-100 may only be reviewed retrospectively. Unlike the majority, however, I would not delegate review of its use to magistrates for a case-by-case determination. The V-100 should be used only in those cases where it is necessary to rescue an individual threatened with serious injury or death.

## II.

The Fourth Amendment prohibits the indiscriminate use of force to gain entry to a house to execute an arrest or search. As the Supreme Court has explained, "reasonableness' is the overriding test of compliance with the Fourth Amendment. . . ." (*Zurcher* v. *Stanford Daily, supra,* 436 U.S. at p. 559 [56 L.Ed.2d at p. 538].) Even searches "supported by a warrant issued on probable cause and properly identifying the place to be searched and the property to be seized" are unlawful if executed in an unreasonable manner. (*Id.,* at p. 560 [56 L.Ed.2d at p. 538]; accord *Dalia* v. *United States* (1979) 441 U.S. 238, 258 [60 L.Ed.2d 177, 193, 99 S.Ct. 1682]; *United States* v. *Lefkowitz* (1932) 285 U.S. 452, 464-465 [76 L.Ed. 877, 882, 52 S.Ct. 420]; see also *Ker* v. *California* (1963) 374 U.S. 23, 38 [10

L.Ed.2d 726, 740-741, 83 S.Ct. 1623].) The same is true, of course, in the case of arrest. (See *Tennessee* v. *Garner, supra,* 471 U.S. at pp. 7-8 [85 L.Ed.2d at pp. 7-8].)

It is equally well settled that "reasonableness" requires the balancing of competing interests. On this point, the majority correctly conclude that, for the purpose of Fourth Amendment analysis, the question as to whether the LAPD may use the V-100 to effectuate a search or arrest must be judged by balancing its intrusion on Fourth Amendment interests against its promotion of legitimate governmental interests. (*Tennessee* v. *Garner, supra,* 471 U.S. at p. 7 [85 L.Ed.2d at p. 7]; *Delaware* v. *Prouse, supra,* 440 U.S. at p. 654 [59 L.Ed.2d at pp. 667-668].)

It does not necessarily follow, however, that such balancing should be done on an ad hoc, case-by-case basis by a magistrate. To the contrary, as the Supreme Court and various legal scholars have observed, "if courts and law enforcement officials are to have workable rules, . . . this balancing must in large part be done on a categorical basis" by the appellate courts. (*Dunaway* v. *New York* (1979) 442 U.S. 200, 219-220 [60 L.Ed.2d 824, 840, 99 S.Ct. 2248] (conc. opn. of White, J.); see also *id.,* at pp. 213-214 [60 L.Ed.2d at pp. 836-837]; *Illinois* v. *Lafayette* (1983) 462 U.S. 640, 647-649 [77 L.Ed.2d 65, 71-73, 103 S.Ct. 2605, 2610-2611]; see generally LaFave, *The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith"* (1982) 43 U.Pitt. L.Rev. 307, 321; Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 375-377, 393-394.)

This latter alternative seems particularly appropriate here, since even under the balancing process which my colleagues would have a magistrate perform, an officer could not use the V-100 to gain entry to a target home.

The intrusiveness of this manner of entry is unparalleled. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (*Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 748 [80 L.Ed.2d 732, 742, 104 S.Ct. 2091]; accord *Payton* v. *New York, supra,* 445 U.S. 573, 585 [63 L.Ed.2d 639, 650]; *United States* v. *United States District Court* (1972) 407 U.S. 297, 313 [32 L.Ed.2d 752, 764, 92 S.Ct. 2125]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 272-276 [127 Cal.Rptr. 629, 545 P.2d 1333].)

Intrusions into the home—even nonconsensual forcible entries—typically do not cause or risk physical injury to the occupants. Use of the V-100, however, risks precisely such injury, as well as several additional extraordinary harms. It risks not just serious physical harm to the occupants as it

"smashes blindly through the walls of a residence" but also injury to the property and persons of those who live nearby (maj. opn., *ante,* at pp. 30, 31). It causes greater damage to the target house than would any conventional means of forced entry. With it, the state proposes to severely damage, if not destroy, the home of a citizen not yet convicted of a criminal offense; to risk his health, if not his life; and to risk harm to his neighbors. In light of these dangers, I must agree with my colleagues that use of the V-100 as the means of gaining entry to homes is presumptively unreasonable under the Fourth Amendment.

Against this presumptively unreasonable intrusion must be weighed society's interests in effective law enforcement. Here, the issue revolves around the police's ability to effectuate an arrest of a person suspected of a crime or to search for evidence of a crime. The law has long prohibited the use of force to enter a home—no matter how de minimis—except in a limited range of circumstances. These include a refusal of admittance following announcement by the police of their authority and purpose, and the existence of an emergency requiring an immediate, unannounced entry, such as the need to prevent loss or destruction of evidence, harm to officers or others, or escape. (*Ker* v. *California, supra,* 374 U.S. at pp. 38-41 [10 L.Ed.2d at pp. 740-743] (opn. of Clark, J.), *id.,* at pp. 54-60 [10 L.Ed.2d at pp. 750-754] (opn. of Brennan, J.); *Miller* v. *United States* (1958) 357 U.S. 301 [2 L.Ed.2d 1332, 78 S.Ct. 1190]; *People* v. *Dumas* (1973) 9 Cal.3d 871, 877 [109 Cal.Rptr. 304, 512 P.2d 1208]; *People* v. *Bradley* (1969) 1 Cal.3d 80, 86-89 [81 Cal.Rptr. 457, 460 P.2d 129]; *People* v. *Gastelo* (1967) 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706]; see also Pen. Code, §§ 844, 845, 855, 1531.)

These settled rules necessarily restrict the scope of the inquiry here. All that need be evaluated is the strength of the state's interest in using the V-100 as a means of gaining entry to a "fortified" structure to carry out a search or arrest in the limited circumstances where a forcible entry is permitted.[7]

Absent exigent circumstances, an occupant's mere refusal to admit the police into his or her home to conduct a lawful search or arrest can never justify use of the V-100. The police have available in their arsenal alternative means of entering even "fortified" structures.

---

[7] The LAPD concedes that there are fully effective, less dangerous means of gaining entry to all but "fortified" houses. It is only against such fortified premises as "rock houses" that they seek the right to use the V-100 in making an arrest or search.

These means are far less destructive and dangerous than an entry with the V-100.[8] Moreover, where there is no danger of destruction of evidence, or escape, or serious injury to officers or others, such means are equally as effective as the V-100, even though somewhat more time-consuming.

Under these circumstances, use of the V-100 would constitute a gratuitously destructive act which would be per se unreasonable under the Fourth Amendment. (*United States* v. *Fernandez* (N.D.Cal. 1976) 430 F. Supp. 794, 800; see also, e.g., *People* v. *Vollheim* (1978) 87 Cal.App.3d 538 [150 Cal.Rptr. 837]; *United States* v. *Moreno* (9th Cir. 1983) 701 F.2d 815, vacated and remanded on other grounds (1984) 469 U.S. 913 [83 L.Ed.2d 223, 105 S.Ct. 286].)

What, then, of a case involving the danger of destruction or loss of evidence? As a practical matter, this danger arises primarily in connection with lawful searches for evidence of drug and gambling offenses, because evidence of these crimes is or can be peculiarly amenable to ready destruction. Here, it is argued that effectiveness in conducting searches for evidence of drug crimes in "fortified" houses requires use of the V-100 because there is no less intrusive alternative that will allow the police to make a sufficiently rapid entry to prevent such destruction.

This argument is unpersuasive for two reasons. First, it lacks evidentiary support. Consider the record. The LAPD has not come forward with even a single incident in which their attempt to execute a warrant on a "rock house" by conventional means resulted in a delay and subsequent destruction of evidence. In every reported incident, the suspects' attempt to destroy narcotics was frustrated by speedy police entry. The LAPD's conclusory statements that such destruction is *likely* to occur absent use of the V-100 are purely speculative.

Second, the Legislature has provided the police with a means of shutting down "rock houses" which is far less intrusive than their destruction by a V-100. (See Health & Saf. Code, §§ 11366, 11366.5, 11366.6.[9]) As a result, the effectiveness of law enforcement efforts to prevent the distribution of dangerous drugs is not dependent upon catching the dealers red-handed.

One of these statutes, section 11366, has been on the books for some time. It makes it a felony to "open[ ] or maintain[ ] any place for the purpose

---

[8] The alternatives available to the police include hand-held sledgehammers and battering rams, Kerry cutting cables, and the use of ropes and a fork-lift to pull off bars or pull down doors.

[9] All subsequent statutory references are to the Health and Safety Code unless otherwise indicated.

of unlawfully selling, giving away, or using" dangerous and unlawful drugs such as, for example, cocaine and heroin.

The other two statutes, sections 11366.5 and 11366.6, are of more recent origin. They were enacted by the Legislature, at the request of the LAPD, among others, in order to give the police a more effective means of eradicating the use of fortified buildings to distribute dangerous drugs than the V-100.[10] Section 11366.5, like section 11366, is specifically directed at landlords who, desirous of obtaining "excessive profits" from their holdings, "knowingly" allow their properties "to be fortified to suppress law enforcement entry in order to further the sale of any amount of cocaine, heroin, or phencyclidine . . . ." (§ 11366.5, subd. (b).) Such individuals are punishable by imprisonment in the state prison for two, three, or four years. (*Ibid.*)

Section 11366.6, on the other hand, is specifically directed at the dealer-on-the-scene, who "utilizes a building, room, space, or enclosure specifically designed to suppress law enforcement entry in order to sell or possess for sale any amount of cocaine, heroin, or phencyclidine . . . ." Such conduct is punishable by imprisonment in the state prison for three, four, or five years for each violation of the statute, a punishment equal to or greater than they would receive if they were found in possession of a saleable quantity of these narcotics. (Cf. § 11366.6, subd. (b) with §§ 11351, 11352, 11378.5.)

Aside from the deterrent effect such statutes can reasonably be expected to have on the proliferation of "rock houses," it is significant that a conviction of these offenses is in no way dependent upon the police catching a dealer or landlord on the premises with narcotics in hand. Proof of possession is not necessary to establish a violation of section 11366 (*People* v.

---

[10] These two statutes were enacted in 1985 pursuant to Assembly Bill No. 1862. (See Stats. 1985, ch. 1533, §§ 1, 2.) The committee reports discussing this bill describe the need for its passage as follows: "Proponents [including the LAPD] contend that fortification of homes, apartments, and other structures gives dealers time to destroy drugs, and valuable evidence and that *use of battering rams and 'other extreme measures' to force entry have thus far been ineffective and highly controversial.* . . ." (Sen. Comm. Rep. on Assem. Bill No. 1862, Sen. Rules Com. (1985) at p. 2 [italics added]; Assem. Com. Rep. on Assem. Bill No. 1862, Com. on Public Safety (1985) at p. 1.)

These committee reports are appropriate sources of legislative intent. (See, e.g., *People* v. *Weidert* (1985) 39 Cal.3d 836, 847, fn. 9 [218 Cal.Rptr. 57, 705 P.2d 380]; *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 219 [185 Cal.Rptr. 270, 649 P.2d 912], and dis. opn. of Mosk, J., at p. 221; *In re Marriage of Brigden* (1978) 80 Cal.App.3d 380, 391 [145 Cal.Rptr. 716].)

*Cannon* (1957) 148 Cal.App.2d 163 [306 P.2d 589]) nor, by parity of reasoning, is it necessary under either section 11366.5 or section 11366.6.[11]

As a result, even in those cases where evidence might be destroyed before police gained entry to a "fortified" structure by conventional means, the people, through their elected representatives, have demonstrated that measures short of the destruction are available to quell such criminal efforts to avoid detection and punishment. The Legislature's prompt and highly commendable action in passing sections 11366.5 and 11366.6 ensures that the community's interest in preventing the distribution of these dangerous drugs cannot be frustrated by narcotics dealers who hide behind even layer-upon-layer of steel bars and doors. With the enactment of these statutes, police resort to weapons of war such as the V-100 are no longer even arguably necessary to stop narcotics dealers in their tracks.

Similar alternatives are available to the police vis-à-vis purveyors of unlawful games of chance, evidence of which is readily amenable to destruction, a class that seemingly would encompass only bookmaking. (See Pen. Code, §§ 337a, 11225-11230.)[12] And, there is no reason to doubt that, should use of "fortified" houses for the distribution of illegal drugs other than heroin, cocaine, and phencyclidine, become a problem, the Legislature will act promptly to extend the reach of sections 11366.5 and 11366.6 to deter and punish such conduct.[13] As a result, I am compelled to conclude that the use of the V-100 is neither sufficiently productive nor necessary to outweigh its intrusion upon Fourth Amendment interests in cases involving a danger of destruction or loss of evidence.

The use of the V-100 in cases involving a "danger of escape" is equally unwise. Effectiveness in preventing escapes scarcely seems likely to be materially improved by using the V-100. On this, my colleagues apparently agree. They, too, would not allow the use of the V-100 in such circumstances, even if authorized by a magistrate. The danger of escape is not one of

---

[11] It is, perhaps, worthy of note that the state was able successfully to convict, under section 11366.5, the owner of three of the four "rock houses" against which the V-100 was used, even though the LAPD apparently " 'never caught him at the houses or with any drugs.' " (Quinn, *Pacoima Cocaine Ring: 'Rock House' Landlord Gets Prison Sentence,* L.A. Times (Mar. 14, 1986) Home Ed., Metro Section, at p. 2.)

[12] Since gambling offenses do not typically involve violence and are classified only as misdemeanors, it cannot seriously be contended that their commission warrants use of such a dangerous and destructive weapon as the V-100. The "seriousness of the underlying criminal offense" is, of course, one of the factors included in the majority's balancing test. (See maj. opn., *ante,* at p. 32.)

[13] In the interim, use of such premises to obstruct the police would be punishable under Penal Code section 148 which proscribes willful resistance, delay, or obstruction of a peace officer in the discharge or attempted discharge of his duties.

the exigencies which they hold would permit its use. (See maj. opn., *ante,* at p. 32.)

This brings us to the final category of cases in which use of force is ever allowable in gaining entry to a home—the threat of serious injury to officers or others. The LAPD insists that effectiveness in making arrests and in conducting searches at "fortified" dwellings requires use of the V-100, where there is a significant danger of armed resistance. We are told that the presence of "fortifications" increases the likelihood that the police will face such resistance if entry is attempted via conventional means.

No evidence has been offered to support this contention. However, even if we were to assume its truth, this argument fails. The simple fact is that there is always an alternative available to the police in the face of a threat that they will be fired upon if they attempt entry by force. They can encircle the target house, announce their authority and purpose, and simply wait out the suspects inside. Eventually, the suspects must surrender.

Alternatively, the police can place the target house under surveillance and wait to serve their search or arrest warrant until the suspects attempt to leave or inadvertently make a point of entry possible. (See, *ante,* fn. 3, at p. 35.)

Such tactics are not new. Nor are they dramatic. But history attests to their effectiveness. Moreover, these are safe alternatives.

The V-100, with all its power, is unable to climb stairs and it will not fit into elevators. Its use against a "fortified" house blocked off by the vehicles of innocent citizens is also not feasible. (See, *ante,* fn. 3, at p. 35.) Given these facts, there seems little reason to endorse its use against a structure fortuitously accessible.

I do not minimize the possibility of attack by the occupants of a "fortified" house on police. However, the citizens of Philadelphia who lost their homes on May 13, 1985, when the police bombed a fortified house there would no doubt have preferred patience to counterattack, especially given the innocent young children who died in the blaze that followed. The events in Philadelphia serve as a reminder that we should be extraordinarily cautious about authorizing use of any weapon of war in our residential neighborhoods. This is especially true if the weapon is not essential to effective law enforcement.[14]

---

[14] On this point, it is interesting to note that the Los Angeles County Sheriff's Department has apparently developed a motorized battering ram that is as effective as the V-100 but involves none of the dangers which the V-100 poses. (Klein, *The Ram at Rest: These are Quiet Times for LAPD's 'Battering' Vehicle,* L.A. Times, *supra,* at p. 1.)

In sum, the only circumstance in which use of the V-100 is even arguably justifiable is for rescue, that is, to save the life of a hostage who is unquestionably in danger. For that reason, I would hold that plaintiffs are entitled to a preliminary injunction prohibiting its use in other circumstances.

**LUCAS, J.,** Concurring and Dissenting.—I concur with the majority opinion to the extent it upholds the trial court's refusal to issue a preliminary injunction precluding police use of "flashbangs" during drug searches. I dissent, however, to the majority's holding that henceforth law enforcement officers must obtain prior judicial authorization before using the V-100 motorized battering ram during such searches. In my view, the courts should neither interfere with, nor restrain the use of, particular law enforcement methods or techniques which play a legitimate role in fighting crime, so long as no unreasonable risk of danger to human life is involved.

The record indicates a legitimate use exists for the V-100, namely, to break into fortified, steel-reinforced houses where drugs are sold or manufactured, for purposes of executing search or arrest warrants. The record also indicates that in many situations, the need for action is *immediate* and any delay beyond obtaining the requisite departmental approval might result in the loss or destruction of incriminating evidence or contraband. (See *Parsley* v. *Superior Court* (1973) 9 Cal.3d 934, 940 [109 Cal.Rptr. 563, 513 P.2d 611].)

The majority voices a concern about the potential dangers to person or property posed by the V-100 ram. But most police work is inherently dangerous, frequently entailing high-speed chases, gunfire and explosives. Yet, obviously we do not require prior judicial authorization in those instances; the existence of prior administrative guidelines and approval procedures, and the availability of civil damage actions is deemed adequate protection for our citizens. No compelling reason exists for singling out the V-100 ram for special treatment; the record indicates that the ram has been used on several prior occasions without inflicting any serious personal injury.

According to the record, elaborate guidelines exist for obtaining administrative approval before using the ram. These guidelines require the officers to take into consideration such factors as the fortified nature of the house under scrutiny, the existence and viability of alternative entries, the expected resistance to a forced entry, and the risk of harm to the entering officers, the suspects and their neighbors. The majority's imposition of yet another layer of review-and-approval procedure, namely, submission of the issue to a magistrate, is both unnecessary and unwise.

The controlling principle is quoted by the majority itself: "[I]t is generally left to the discretion of the executing officers to determine the details of

how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.'" (*Dalia* v. *United States* (1978) 441 U.S. 238, 257, fn. omitted [60 L.Ed.2d 177, 192, 99 S.Ct. 1682].) In my view, given the fact that the V-100 ram is only used to enter fortified houses where narcotics transactions occur, and that careful administrative scrutiny is required before each use, no Fourth Amendment violation can arise here.

I would affirm the judgment denying the preliminary injunction.

Panelli, J., concurred.

The petition of real parties in interest for a rehearing was denied February 26, 1987.