[No. C012461. Third Dist. Apr. 6, 1992.]

DEPARTMENT OF PERSONNEL ADMINISTRATION et al., Petitioners,
v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
CECIL GREENE et al., Real Parties in Interest.

**COUNSEL**

Christopher W. Waddell, Tamara J. Pierson, Edmund K. Brehl, Roy J. Chastain, Joan Branin, Paul M. Starkey, Warren Curtis Stracener, and K. William Curtis for Petitioners.

No appearance for Respondent.

Dennis F. Moss, D. Robert Schuman, Richard J. Chivaro, Gary P. Reynolds, Howard Schwartz, Williams, Kelly, Romanski, Polverari & Skelton, Darrell Steinberg, Richard Romanski, Liza E. Aguiar, Carroll, Burdick & McDonough, Ron Yank, Gary M. Messing, Richard M. Pattison, Van Bourg, Weinberg, Roger & Rosenfeld, Stewart Weinberg and John W. Spittler for Real Parties in Interest.

**OPINION**

**PUGLIA, P. J.**—Petitioners, Department of Personnel Administration and its Director, David Tirapelle, seek a writ of mandate compelling respondent superior court to set aside its judgment issuing a peremptory writ of mandate. The writ issued by respondent court compels petitioners and Controller Gray Davis to desist and refrain from reducing the wages of state employees in recognized bargaining units, and from changing the health care premium contribution formula for those employees. At issue is whether, after bargaining to impasse with state employee unions, petitioners may impose their last, best offer on wages and health care premium contribution formulas. We shall conclude as a matter of statutory construction that the Legislature delegated to petitioners authority after impasse to impose their last, best offer with regard to health care premium contributions but not with regard to wages. We shall therefore issue a writ of mandate to vindicate the authority delegated to petitioners with regard to health care premium contributions and deny the petition in all other respects.

I

The State of California faced an unprecedented budgetary crisis at the outset of fiscal year 1991-1992, with expenditures projected to exceed revenues by more than $14 billion. Although the Legislature and the Governor addressed the budget shortfall in a number of ways in the Budget Act of 1991 (the Act; Stats. 1991, ch. 118), the Act does not direct a pay cut for state employees. Rather, it requires a $351 million reduction of employee compensation, and orders the Director of Finance to allocate the necessary reductions to each item of appropriation in the Act, with three exceptions.[1] The Governor also reduced the funds provided by the Legislature for employee compensation and benefit increases. (Stats. 1991, ch. 118, § 2, pp. 473-477, items 9800-001-001, 9800-001-494, 9800-001-988 & 9800-011-001; Governor's Objections to Budget Act of 1991, Stats. 1991, ch. 118, pp. 17-18.)[2] The Governor gave his reasons for the reductions and approved the Act on July 16, 1991. (Stats. 1991, ch. 118.)

In this setting, negotiations continued for new collective bargaining agreements between petitioner Department of Personnel Administration (DPA) and various unions representing state employees. For purposes of this proceeding, the parties do not dispute that by autumn 1991, DPA and many of the unions had reached impasse, after negotiating and participating in mediation in good faith.

On November 5, 1991, DPA sent letters to two of the employee unions which are real parties in interest herein, California Association of Professional Scientists (CAPS) and California Association of Highway Patrolmen (CAHP), informing them of actions DPA intended to take, effective November 12, 1991, as a result of the negotiations impasse. The letter to CAPS indicated DPA would implement terms and conditions of employment as follows: "1. Where a Government Code or DPA Rule exists, the State will

---

[1]Statutes 1991, chapter 118, section 3.90, page 486 provides: "Notwithstanding any other provision of this act, each item of appropriation in this act shall be reduced, as appropriate, to reflect a $351,000,000 reduction in General Fund employee compensation items. [¶] The Director of Finance shall allocate the necessary reductions to each item of appropriation to accomplish the reductions required by this section. [¶] This section shall not apply to appropriations made by Items 0110-001-001 [appropriations to the Senate], 0120-011-001 [appropriations to the Assembly], and 0160-001-001 [appropriations to the Legislative Counsel Bureau] of Section 2.00 of this act."

[2]We are not called upon to consider the effect of the Governor's objection to section 4 of the Act, regarding the state's level of contributions to health care premium rate increases. (Stats. 1991, ch. 118, § 4, pp. 486-487; Governor's Objections to Budget Act of 1991, Stats. 1991, ch. 118.) The parties do not contend that the action of the Legislature and Governor left insufficient funds to pay increases in state employees' health benefit rates.

adhere to the provisions of the Code or Rules. In the absence of a collective bargaining agreement, these Code and Rule Sections must be followed regardless of whether the benefit is lesser or greater than the corresponding language of the expired contract, or the State's last offer. . . . [¶] 2. Where no Government Code or DPA Rule is controlling, the State will maintain the status quo on all terms and conditions of employment specified in the expired [memorandum of understanding], *except for the following conditions specified in our final offer:* [¶] *Salaries* [¶] Effective November 12, 1991, salaries will be reduced five (5) percent as described in the State's offer of June 24, 1991. A pay letter will be issued to effectuate this change. [¶] *Health Benefits* [¶] Effective December 1, 1991, the State employer's contribution rates will be: $157.—employee; $292.—employee plus one dependent; and, $367.—employee plus two or more dependents. These rates, as well as the rural subsidy rates, are as described in the State's last offer of August 12, 1991. [Note: Any increase in employee costs will be deducted from the November pay warrant.]" The letter to CAHP was substantially the same.

CAPS and CAHP responded to DPA's notification of its intent to impose its final offer by filing a petition for writ of mandate and request for a stay in respondent superior court on November 8, 1991. That day, respondent court issued an alternative writ and a stay, ordering petitioners not to reduce the salaries or health care contributions for state employee members of CAPS and CAHP until respondent issued a final decision on the petition.

In addition to the two unions, the petition in the superior court named as petitioners Senators Cecil Greene and Lucy Killea, and Assemblyman Xavier Becerra. Subsequently, Senator Ralph Dills was named as a petitioner in the first amended petition in the superior court.[3] Later, a number of other unions representing state employees joined in the proceeding as real parties in interest and interveners.[4] In addition, the Public Employment Relations Board (PERB) filed a "Statement of Jurisdiction," in the superior court

[3]Although DPA argued in the superior court that the legislators named as petitioners lacked standing as parties to the proceeding, DPA has not renewed that contention here. We need not resolve the question as the arguments presented by the legislators are identical to those presented by CAPS and CAHP, which unquestionably have standing.

[4]These unions, named also in the instant proceeding as real parties in interest, are Professional Engineers in California Government, Association of California State Attorneys and Administrative Law Judges, California Union of Safety Employees, California State Employees Association, California Federation of the Union of American Physicians and Dentists, California Department of Forestry Employees Association, and California Association of Psychiatric Technicians.

After this court issued an alternative writ of mandate, Stationary Engineers Local 39, International Union of Operating Engineers and International Union of Operating Engineers,

proceeding asserting PERB lacks exclusive initial jurisdiction over this dispute.[5]

After a hearing, respondent superior court indicated it would issue a writ of mandate. The court explained that Government Code section 19826, subdivision (b) expressly precludes DPA from unilaterally reducing employee wages.[6] The court reasoned the Legislature in section 19826, subdivision (b) delegated to DPA limited authority to set salaries, retaining a portion of this authority in the event of an intractable dispute or impasse between DPA and an employee union. Moreover, the court concluded, in the absence of a memorandum of understanding (MOU) between DPA and an employee union (see § 3517.5), the formula for state contributions to employee health care premiums in section 22825.1, applies so as to preclude DPA from decreasing employee health care premium contribution rates. Finally, the court determined the issues presented are not within the exclusive initial jurisdiction of PERB because the ultimate question goes to the nature of the delegation of authority from the legislative branch to the executive branch, a question peculiarly within the purview of the judicial branch.

On November 27, 1991, respondent superior court entered judgment granting a peremptory writ of mandate. The writ issued that day, commanding DPA, its director and the Controller ". . . to desist and refrain from reducing the wages of State employees in recognized bargaining units, and desist and refrain from modifying the health care premium payment formula for said employees."

DPA filed the instant petition for extraordinary relief on December 13, 1991. On January 9, 1992, we issued an alternative writ of mandate and notified the parties that any written return was to be filed on or before January 29, 1992, and any replication within 10 days thereafter. We also denied DPA's request for a stay. On January 14, 1992, we directed the parties to address in their briefing the question, assuming PERB had exclusive initial jurisdiction, whether any exception to the doctrine of exhaustion of administrative remedies applies so as to excuse the failure to file unfair practice charges with PERB.

---

Crafts—Maintenance Division, Unit 12 (Unit 12) filed a request to intervene as real parties in interest. On March 2, 1992, we granted that request. On March 9, 1992, interveners formally joined in the briefs filed by the identically situated real parties in interest.

[5]DPA has named PERB as a real party in interest in this original proceeding. PERB filed a demurrer, claiming that it is not a real party in interest. A ruling on PERB's demurrer is not necessary to the resolution of this proceeding.

[6]Further statutory references to sections of an undesignated code are to the Government Code.

## II

By issuing an alternative writ of mandate, we have concluded there is no plain, speedy and adequate remedy in the ordinary course of law. (*Langford* v. *Superior Court* (1987) 43 Cal.3d 21, 27 [233 Cal.Rptr. 387, 729 P.2d 822]; Code Civ. Proc., § 1086.) " '[T]he issues presented are of great public importance and must be resolved promptly[,]' " and we shall therefore exercise our original mandamus jurisdiction. (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 598 [116 Cal.Rptr. 361, 526 P.2d 513], quoting *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593]; see also *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 699-700 [166 Cal.Rptr. 331, 613 P.2d 579]; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 581 [71 Cal.Rptr. 739].)

## III

At the threshold is the question whether respondent superior court improperly assumed jurisdiction over a matter which is committed to PERB's exclusive initial jurisdiction. DPA contends PERB has exclusive jurisdiction because DPA's action in implementing its last, best offer arguably is either protected or prohibited as an unlawful practice under the statutes regulating state employer-employee labor relations. DPA points out that resolution of the underlying questions regarding DPA's authority after impasse to impose its last, best offer on wages and health contribution rates necessarily requires consideration and construction of the applicable labor relations statute, and contends such analysis should first be undertaken by PERB. DPA relies by analogy on authority under the Educational Employment Relations Act (EERA; § 3540 et seq.), as well as section 3514.5, part of the labor relations statute applicable to state employees, (§ 3512 et seq., the Ralph C. Dills Act, formerly, the State Employer-Employee Relations Act; hereafter, the Dills Act). (Stats. 1991, ch. 338, § 1.)

We shall assume without deciding that DPA is correct on the jurisdictional question. Nevertheless, we shall conclude the state employee unions' failure to exhaust their administrative remedy by first filing charges of unfair practices with PERB is excused in this case because of the potential for irreparable injury and because filing with PERB would have been futile under the circumstances.

The rule requiring deferral to PERB's exclusive initial jurisdiction is frequently labeled "preemption," after the federal preemption doctrine developed under the National Labor Relations Act (NLRA). However, deferral

to PERB's initial jurisdiction is actually a function of the well-established doctrine of exhaustion of administrative remedies, and the codification of that doctrine in the state labor relations statutes.

In *San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 7, 14 [154 Cal.Rptr. 893, 593 P.2d 838], a case arising under the EERA, the court annulled contempt orders against a union and its president who conducted a strike in violation of a restraining order and an injunction obtained by a school district. The court held the school district failed to exhaust its administrative remedy by first filing an unfair practice charge with PERB based on strike activity which was arguably prohibited by the EERA. (See also *El Rancho Unified School Dist.* v. *National Education Assn.* (1983) 33 Cal.3d 946, 953 [192 Cal.Rptr. 123, 663 P.2d 893] [explaining holding in *San Diego Teachers Assn.* as an adoption of the federal preemption doctrine under the NLRA whereby the National Labor Relations Board (NLRB) has exclusive jurisdiction over activities arguably protected or prohibited under the NLRA].) As in the EERA, the requirement of exhaustion of administrative remedies is codified in the Dills Act, in Government Code section 3514.5, which in relevant part provides: "The initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of [PERB]."

In describing the need for exhaustion of administrative remedies with PERB, the court in *San Diego Teachers Assn.* analogized to the conflict between the NLRA and state courts which is the basis for the federal preemption doctrine: "Though the rule as it relates to NLRB has been enunciated in the context of conflict between a federal agency and state courts, a like principle applies to parallel conflicts between California agencies and courts. (*United Farm Workers* v. *Superior Court* (1977) 72 Cal.App.3d 268, 273 [140 Cal.Rptr. 87] (declaratory relief unavailable when issue could be raised in ALRB proceeding); cf. *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977 [88 Cal.Rptr. 533] (police officers' suit over terms of employment precluded by failure to resort to grievance procedure).)" (*San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d at p. 12.) The *United Farm Workers* decision further explained the purpose of the rule as serving to develop the expertise of an administrative agency, and to avoid conflicting decisions between that agency and local tribunals. (*United Farm Workers* v. *Superior Court, supra,* 72 Cal.App.3d at pp. 272-273.)

However, *San Diego Teachers Assn.* made clear that PERB preemption ultimately involves the doctrine of exhaustion of administrative remedies, by

explaining it was unnecessary to consider the legality of public employee strikes "if the injunctive remedies were improper because of the district's failure to exhaust its administrative remedies under the EERA." (*San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d at p. 7, citing *Environmental Law Fund, Inc.* v. *Town of Corte Madera* (1975) 49 Cal.App.3d 105, 112 [122 Cal.Rptr. 282].) The court further indicated the preemption rule is grounded in the exhaustion doctrine by its reliance on *Morton* v. *Superior Court, supra,* 9 Cal.App.3d 977. *Morton* held a suit by police officers over terms of employment was precluded by the failure to exhaust the available administrative remedy, i.e., the union grievance procedure. (*Id.* at p. 981.)

■ Indeed, the preeminent policies underlying the judicially created exhaustion doctrine are identical to the policies underlying the federal preemption rule. In *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942, 132 A.L.R. 715], the court described the purpose of the exhaustion doctrine: "The courts have repeatedly recognized the necessity of placing the numerous and complex problems arising under statutes of the type involved herein in the hands of expert bodies, familiar with the subject matter through long experience. They have pointed out that to permit the initial consideration of these matters by the courts would not only preclude the efficient operation of the acts, but would overwhelm the courts with cases of a technical, specialized character, and seriously impair their capacity to handle their normal work." (17 Cal.2d at p. 306.)

Later cases have described additional policies served by the exhaustion doctrine. Thus, the exhaustion doctrine facilitates the development of a complete record prior to resort to the courts (*Yamaha Motor Corp.* v. *Superior Court* (1986) 185 Cal.App.3d 1232, 1240-1241 [230 Cal.Rptr. 382]) and, because administrative procedure is part of the legislative process, the doctrine fulfills separation of powers concerns by requiring completion of the administrative procedure prior to court action (*County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62, 76-77 [222 Cal.Rptr. 750]).

■ However, none of these policies would be served by adherence to the exhaustion doctrine in this case. When the underlying mandate proceeding was filed in the superior court, PERB took the somewhat unusual step of filing a statement disavowing jurisdiction over the dispute. Under these circumstances, the separation of powers concern articulated in *County of Contra Costa, supra,* is not implicated because the administrative body has in fact invited judicial intervention. Moreover, the facts are undisputed, so there is no need for administrative development of the record. Nor does judicial intervention interfere with the expertise of the agency or create

problems of judicial economy, given that the underlying issues are within the expertise of the courts and would undoubtedly be resolved ultimately by the courts even if initial jurisdiction were found in PERB. Finally, given that this case raises questions of first impression which are bound for ultimate determination by the appellate courts, there is little concern of conflicting decisions between PERB and the courts.

■ Given the lack of policy support for the application of the exhaustion doctrine in this case, it behooves us to examine the exceptions to that doctrine. "*Abelleira* makes it abundantly clear that the exhaustion doctrine does *not* implicate subject matter jurisdiction but rather is a 'procedural prerequisite' 'originally devised for convenience and efficiency' and now 'followed under the doctrine of *stare decisis*, . . .' ([17 Cal.2d] at pp. 288, 291.) It is 'jurisdictional' only in the sense that a court's failure to apply the rule in a situation where the issue has been properly raised can be corrected by the issuance of a writ of prohibition. [¶] Such a conclusion only makes sense when the underlying nature of the exhaustion doctrine is considered. While *Abelleira* indicates that the rule of exhaustion of administrative remedies has become 'a fundamental rule of procedure' (17 Cal.3d [*sic*] at p. 293), courts have repeatedly recognized it is not inflexible dogma. [Citations.] ■ There are numerous exceptions to the rule including situations where the agency indulges in unreasonable delay [citation], when the subject matter lies outside the administrative agency's jurisdiction, when pursuit of an administrative remedy would result in irreparable harm, when the agency is incapable of granting an adequate remedy, and when resort to the administrative process would be futile because it is clear what the agency's decision would be. [Citations.]" (*Green* v. *City of Oceanside* (1987) 194 Cal.App.3d 212, 222 [239 Cal.Rptr. 470], original italics.)

■ Respondent superior court excused exhaustion of the administrative remedy in this case because the ultimate legal issues, touching upon the separation of powers between the legislative and executive branches, are better suited for determination by the courts. However, constitutional challenges are frequently raised to the application of an administrative statutory scheme, yet the courts typically require such issues be presented to the administrative agency in the first instance. (See, e.g., *Security-First Nat. Bk.* v. *County of L. A.* (1950) 35 Cal.2d 319, 321 [217 P.2d 946]; *Lund* v. *California State Employees Assn.* (1990) 222 Cal.App.3d 174, 183 [271 Cal.Rptr. 425]; *Leek* v. *Washington Unified School Dist.* (1981) 124

Cal.App.3d 43, 53 [177 Cal.Rptr. 196].) Hence, exhaustion cannot be excused on this basis.[7]

■ However, the unique circumstances presented here suggest exhaustion should be excused under the irreparable injury and futility exceptions. The irreparable injury exception was first recognized in *Abelleira*, where the court acknowledged the exception has been applied in cases ". . . dealing with rate orders of regulatory commissions, where the administrative body imposes a confiscatory rate on a public utility. Continued operation of the business at the rate imposed pending an appeal may in some instances be so unprofitable as to amount to a destruction of the business, and therefore a taking of property without due process of law." (*Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d at p. 296.) The irreparable injury exception has been rarely applied. (See, e.g., *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 6-7 [95 Cal.Rptr. 329, 485 P.2d 529 , 46 A.L.R.3d 351] [bar owners sought writ of mandate to prevent Alcoholic Beverages Commission from revoking their licenses because they hired women bartenders, contrary to Bus. & Prof. Code, § 25656; owners "placed in the untenable situation of having to choose whether to obey possibly conflicting federal and state laws and face a penalty under the one they choose to disobey"]; *Greenblatt* v. *Munro* (1958) 161 Cal.App.2d 596, 605-607 [326 P.2d 929] [court reached question whether bar owner's conduct violated Penal Code provision so that the Department of Alcoholic Beverage Control would have benefit of that decision in reconsidering extent of penalty to impose on bar owner].)

Here, the state and its employees may suffer irreparable injury if deprived of a judicial ruling on the underlying issues prior to the expiration of the 1991-1992 fiscal year. Indeed, DPA's verified petition filed in this original proceeding acknowledges the immediate need for judicial intervention by arguing that unless the respondent court's decision is immediately reversed, ". . . there will be an irrevocable impact on the State's ability to balance the 1991/1992 budget which will force a reduction in the number of State employees and the layoff of an even greater number of State employees, with a corresponding greater reduction in the delivery of essential State services than would occur if Petitioners were permitted to implement the adjustments to the salary and health care premium contribution consistent with their last, best, and final offer." This allegation is supported by the declaration of Susanne Burton, Chief Deputy Director of the Department of

---

[7]Courts have not required exhaustion where the petitioner raises a facial challenge to the constitutionality of the administrative agency's jurisdictional statute. (See, e.g., *Lund* v. *California State Employees Assn., supra,* 222 Cal.App.3d at p. 183.) But no such challenge is raised here.

Finance, filed contemporaneously with the original petition in˙this matter. Ms. Burton declares, "The expenditure reductions to meet the cut in state operations funding must be achieved within the 1991-92 fiscal years [*sic*], which is already over five months old. *Every day that passes without achieving some savings proportionately increases the amount of savings that must be realized in the remaining days of the fiscal year.* For example, if one thousand positions must be vacated for a full fiscal year to achieve a savings target then twice as many positions (two thousand) would have to be vacated to achieve the same savings within six months of the fiscal year." (Italics added.)

We take seriously the urgent need for definitive judicial review of this matter prior to the end of the 1991-1992 fiscal year. Because of the unprecedented nature of the fiscal crisis faced by the state, the urgent need for resolution of these issues prior to the end of the year, and the great potential for irreparable harm in the nature of increased layoffs of state employees, we believe the failure of the unions to exhaust their administrative remedy by filing an unfair practice charge with PERB should be excused. We recognize that had the unions filed unfair practice charges with PERB, there was at least the possibility that PERB could have ordered the same relief as that provided by respondent superior court (see §§ 3513, subd. (h), 3541.3, subd. (j)). However, it is extremely unlikely the entire process of PERB adjudication followed by judicial review (see § 3520) would have been completed prior to the end of this fiscal year.

Exhaustion should be excused for another, interrelated reason. ▉ Exhaustion is excused for futility ". . . when the aggrieved party can positively state what the administrative agency's decision in his particular case would be." (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761].) ▉ Our record does not reveal whether the unions knew PERB was declining to take jurisdiction over this matter at the time they filed their petition for extraordinary relief in the respondent superior court. However, we note PERB filed its "Statement of Jurisdiction" one week after that petition was filed. Thus, virtually at the outset of this dispute, the parties were informed what PERB's decision would be as to the underlying jurisdictional question. Assuming exhaustion of PERB's remedy was required, PERB's action in declining jurisdiction would have required the unions to seek extraordinary relief to compel PERB to consider their unfair practice charges. ▉▉▉ This process would undoubtedly have so extended the time to obtain a final judicial determination of the

merits of this dispute as to render it impossible of resolution during the 1991-1992 fiscal year.[8]

For all of the reasons stated, we conclude that, assuming PERB had exclusive initial jurisdiction, the unions' failure to exhaust their administrative remedy by pursuing unfair labor practice charges with PERB is excused.

## IV

We turn now to the principal substantive issue, whether DPA may impose its last, best offer on wages after bargaining to impasse with the exclusive representatives of state employees in recognized bargaining units. The respondent court concluded section 19826, subdivision (b), in declaring DPA "shall not establish, adjust, or recommend a salary range," unambiguously precludes DPA from implementing its final wage proposal at impasse. We agree.[9]

---

[8]We express no opinion as to the propriety of PERB's filing the "Statement of Jurisdiction" in the superior court. Although DPA contends the respondent superior court erred by considering that statement in reaching its decision, DPA never objected to the statement below, and therefore waived any objection.

Nor do we intend to suggest a rule that would permit an administrative agency to control the question of its jurisdiction by filing a "Statement of Jurisdiction" in judicial proceedings. However, because PERB did so in this case, it is obvious the process of seeking a writ to compel PERB to assume jurisdiction would have greatly increased the time required to resolve this dispute, thus aggravating the potential irreparable injury. The need to resolve the legal questions in this case by an urgent deadline distinguishes *Morton* v. *Hollywood Park, Inc.* (1977) 73 Cal.App.3d 248 at page 254 [139 Cal.Rptr. 584], where the court recognized the usual rule that exhaustion of administrative remedies, when necessary, includes petitioning for extraordinary relief to compel the administrative agency to take jurisdiction.

[9]Section 19826 provides:

"(a) The department [DPA] shall establish and adjust salary ranges for each class of position in the state civil service subject to any merit limits contained in Article VII of the California Constitution. The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities. In establishing or changing such ranges consideration shall be given to the prevailing rates for comparable service in other public employment and in private business. The department shall make no adjustments which require expenditures in excess of existing appropriations which may be used for salary increase purposes. The department may make a change in salary range retroactive to the date of application for such change.

"(b) Notwithstanding any other provision of law, the department shall not establish, adjust, or recommend a salary range for any employees in an appropriate unit where an employee organization has been chosen as the exclusive representative pursuant to Section 3520.5.

"(c) On or before January 10 of each year, the department shall submit to the parties meeting and conferring pursuant to Section 3517 and to the Legislature, a report containing

Although DPA concedes a literal interpretation of section 19826, subdivision (b) would preclude DPA from unilaterally reducing wages for represented employees, DPA argues this result would be repugnant to the policies of the Dills Act, which must include the authority of DPA to impose its final offer at impasse.[10] Further, DPA asserts this literal interpretation achieves an absurd result, rendering collective bargaining meaningless by returning the dispute at impasse to the legislative forum. As an alternative to a literal reading of the provision, DPA asserts the legislative history shows the Legislature intended section 19826, subdivision (b) to apply to DPA solely in its role as the salary-setter for state employees and not in its separate role as the Governor's designated representative for meeting and conferring with state employees' exclusive representatives.[11]

 "In construing a statute 'we begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] 'An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them.' [Citations.] Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the

the department's findings relating to the salaries of employees in comparable occupations in private industry and other governmental agencies.

"(d) If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5, the memorandum of understanding shall be controlling without further legislative action, except that if such provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act."

[10]The expression "represented employees" refers to those state employees who are covered by the Dills Act and have chosen an exclusive representative, which then has the exclusive right to represent the employees in negotiations with the state. (See §§ 3515, 3515.5.) The Dills Act applies to "state employees," defined as "any civil service employee of the state, and the teaching staff of schools under the jurisdiction of the State Department of Education or the Superintendent of Public Instruction, except managerial employees, confidential employees, supervisory employees, employees of [DPA], professional employees of the Department of Finance engaged in technical or analytical state budget preparation other than the auditing staff, professional employees in the Personnel/Payroll Services Division of the Controller's office engaged in technical or analytical duties in support of the state's personnel and payroll systems other than the training staff, employees of the Legislative Counsel Bureau, employees of [PERB], conciliators employed by the State Conciliation Service within the Department of Industrial Relations, and intermittent athletic inspectors who are employees of the State Athletic Commission." (§ 3513, subd. (c).) The employees excluded from the definition of "state employee" in section 3513, subdivision (c) are now defined as "excluded employees." (§ 3527, subd. (b).)

[11]The Dills Act defines the state employer as "the Governor or his or her designated representatives" for purposes of bargaining or meeting and conferring in good faith. (§§ 3513, subd. (j), 3517.) Section 19815.4, subdivision (g) makes the Director of DPA the "Governor's designated representative pursuant to Section 3517."

Legislature. [Citations.] 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citations.]" (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) Of course, courts will not adopt a literal interpretation of a statute if it would achieve an absurd result, or a result repugnant to the obvious purpose of the statute. (*Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 218-219 [188 Cal.Rptr. 115, 655 P.2d 317]; *Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382, 388 [207 Cal.Rptr. 652].)

▮ The plain language of section 19826 supports the respondent court's conclusion that DPA may not unilaterally decrease salaries for represented employees. Subdivision (a) of section 19826 requires DPA to "establish and adjust" the salary ranges of all civil service employees of the state. But section 19826, subdivision (b) acts as an exception to subdivision (a) by providing that notwithstanding other provisions of law, DPA shall not "establish, adjust, or recommend a salary range for any employees in an appropriate unit where an employee organization has been chosen as the exclusive representative pursuant to Section 3520.5." Section 3520.5 is part of the Dills Act. Hence, subdivision (a) applies solely to excluded employees or nonrepresented employees, while subdivision (b) applies to represented employees. The latter subdivision unambiguously precludes DPA from adjusting represented employees' salaries. DPA points to no statutory language in section 19826 or elsewhere that suspends subdivision (b)'s operation during impasse situations.[12]

As we shall explain, respondent court's conclusion is further supported by the legislative history of section 19826 and the Dills Act, and by related provisions of the Dills Act itself. Thus we shall conclude DPA lacked authority to impose its last, best offer on wages after negotiating to impasse with the state unions.

A

▮ The Dills Act is a "supersession statute," designed so that, in the absence of a MOU, as is the case when an existing MOU has expired and the parties have bargained to impasse, numerous Government Code provisions

---

[12]The only other language in section 19826 relevant to this proceeding is found in subdivision (d), which permits the parties to supersede the section's operation by agreeing to a MOU the provisions of which are in conflict with section 19826. This would, for example, permit a union to agree that DPA would adjust salaries for employees who are represented by that union. The parties in this case, having arrived at impasse, manifestly have not so agreed.

concerning state employees' wages, hours and working conditions take effect. One of the provisions which is effective in the absence of a MOU is section 19826.

Prior to the enactment of the Dills Act in 1977, state employees' wages, hours and working conditions were determined by numerous provisions of the Government Code. For example, former section 18001 (now § 19824 [Stats. 1981, ch. 230, § 55, p. 1168]) governed the frequency of pay, former section 18025 (now § 19853 [Stats. 1981, ch. 230, § 55, p. 1168]) governed state holidays and former section 18854 (now § 19832 [Stats. 1981, ch. 230, § 55, p. 1168]) governed merit salary adjustments. The Dills Act, in section 3517.6, now expressly permits DPA and the state employee unions to supersede the above statutory provisions and more than 120 others governing state employees' wages, hours and working conditions by agreeing to MOU's which conflict with these provisions.[13]

In this fashion, the Legislature structured the Dills Act differently than the Meyers-Milias-Brown Act (MMBA) (§§ 3500-3510) and EERA, earlier statutes dealing with public employer-employee relations, with implications

---

[13]Section 3517.6 provides:

"In any case where the provisions of Section 70031 of the Education Code, or subdivision (i) of Section 3513, or Section 14876, 18714, 19080.5, 19100, 19143, 19261, 19818.16, 19819.1, 19820, 19822, 19824, 19826, 19827, 19828, 19829, 19830, 19831, 19832, 19833, 19834, 19835, 19836, 19837, 19838, 19839, 19840, 19841, 19842, 19843, 19844, 19845, 19846, 19847, 19848, 19849, 19849.1, 19849.4, 19850.1, 19850.2, 19850.3, 19850.4, 19850.5, 19850.6, 19851, 19853, 19854, 19856, 19856.1, 19858.1, 19858.2, 19859, 19860, 19861, 19862, 19862.1, 19863, 19863.1, 19864, 19866, 19869, 19870, 19871, 19871.1, 19872, 19873, 19874, 19875, 19876, 19877, 19877.1, 19878, 19879, 19880, 19880.1, 19881, 19882, 19883, 19884, 19885, 19887, 19887.1, 19887.2, 19888, 19990, 19991, 19991.1, 19991.2, 19991.3, 19991.4, 19991.5, 19991.6, 19991.7, 19992, 19992.1, 19992.2, 19992.3, 19992.4, 19993, 19994.1, 19994.2, 19994.3, 19994.4, 19995, 19995.1, 19995.2, 19995.3, 19996.1, 19996.2, 19998, 19998.1, 20750.11, 21400, 21402, 21404, 21405, 22825, or 22825.1 are in conflict with the provisions of a memorandum of understanding, the memorandum of understanding shall be controlling without further legislative action. In any case where the provisions of Section 19997.2, 19997.3, 19997.8, 19997.9, 19997.10, 19997.11, 19997.12, 19997.13, or 19997.14 are in conflict with the provisions of a memorandum of understanding, the terms of the memorandum of understanding shall be controlling unless the State Personnel Board finds those terms to be inconsistent with merit employment principles as provided for by Article VII of the California Constitution. Where this finding is made, the provisions of the Government Code shall prevail until those affected sections of the memorandum of understanding are renegotiated to resolve the inconsistency. If any provision of the memorandum of understanding requires the expenditure of funds, those provisions of the memorandum of understanding shall not become effective unless approved by the Legislature in the annual Budget Act. If any provision of the memorandum of understanding requires legislative action to permit its implementation by amendment of any section not cited above, those provisions of the memorandum of understanding shall not become effective unless approved by the Legislature."

significant to the question of the post impasse process. Under the MMBA, the local public agency must negotiate with local public employee unions regarding "all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment," except for "the merits, necessity, or organization of any service or activity provided by law or executive order" (§ 3504) and subject to provisions of existing state law and local charters, ordinances, and rules establishing a civil service system. (§§ 3500, 3505; *Huntington Beach Police Officers' Assn.* v. *City of Huntington Beach* (1976) 58 Cal.App.3d 492, 499-505 [129 Cal.Rptr. 893].) Under the EERA, school districts must negotiate with school employee unions over "wages, hours of employment, and other terms and conditions of employment," but the phrase "terms and conditions of employment" is expressly limited to certain specified subjects, and the parties are expressly prohibited from superseding provisions of the Education Code and school district rules and regulations pertaining to tenure or a merit or civil service system. (§§ 3540, 3543.2.)

Under the Dills Act, the parties may negotiate over "wages, hours, and other terms and conditions of employment," except the "merits, necessity, or organization of any service or activity provided by law or executive order" and subject to the limitation that the State Personnel Board may declare certain provisions of MOU's to be inconsistent with merit employment principles. (§§ 3516, 3517.6.) However, unlike the earlier public employer-employee relations statutes, the Dills Act permits the parties to supersede numerous statutory provisions relating to wages, hours, and terms and conditions of employment in the state service, as specified in section 3517.6.

None of these three labor relations statutes requires the parties to reach agreement, but merely to bargain in good faith in an endeavor to reach agreement. (MMBA, § 3505; the Dills Act § 3517; EERA, § 3540.1, subd. (h).) Having done so, but having failed to reach agreement, the parties are at impasse.

DPA contends the Dills Act implicitly permits DPA to impose its last, best offer at impasse, where the MOU, having by its terms expired, is no longer in existence. But, the Dills Act by its express terms does not permit DPA immediately to do so. Unlike the EERA and MMBA, where at impasse there is essentially a vacuum, the Dills Act fills the vacuum. Any of the numerous statutory provisions specified in section 3517.6 which were superseded by conflicting terms in a subsisting MOU are no longer superseded once the MOU expires and those provisions then go into effect.

The Legislature's intention to have the statutory provisions listed in section 3517.6 apply in the absence of a MOU is further demonstrated by an

additional difference between the EERA and the Dills Act. Under the EERA, once the parties have bargained to impasse and pursued mediation to no avail, upon the mediator's declaration that factfinding is appropriate, either party may demand factfinding. (§ 3548.1.) At the conclusion of the fact-finding procedure, the factfinding panel recommends terms of settlement to the school district employer. However, the panel's recommendations are advisory only. (§§ 3548.2-3548.3.) This scheme contemplates a power in the school district to reject the panel's advisory recommendations and instead impose the district's final offer. In contrast, the Dills Act contains no procedure for factfinding after mediation.[14]

Indeed, DPA's postimpasse letters to the employee unions informing them of its intention to impose its last, best offer are consistent with this analysis of the Dills Act. In those letters, DPA informed the unions the State would adhere to the provisions of the Government Code or DPA rules. The letters state: "In the absence of a collective bargaining agreement, these Code and Rule sections must be followed regardless of whether the benefit is lesser or greater than the corresponding language of the expired contract, or the State's last offer." The Government Code provisions must be followed because, under section 3517.6, they are no longer superseded.

The structure of the Dills Act demonstrates the Legislature's delegation to DPA of its authority over state employees' wages, hours and working conditions was not entire. In section 3517.6, the Legislature delegated to DPA and the state unions the authority to determine numerous aspects of state employment by superseding statutory provisions in conflict with MOU's. The Legislature could have achieved the same result simply by repealing the provisions designated for supercession in section 3517.6. By instead allowing the parties to supersede those provisions by negotiated agreements, the Legislature insured that in the absence of an agreement, those aspects of state employment would continue to be determined by the Legislature.[15]

It is significant also that the Legislature included section 19826 within the numerous Government Code sections specified in section 3517.6, which may

---

[14]Prior to the enactment of the Dills Act, the Legislature rejected a state labor relations statute which would have provided for factfinding. (Sen. Bill No. 275 (1975-1976 Reg. Sess.) § 3, Jan. 23, 1975, at §§ 3538-3540, pp. 26-29.)

[15]We do not presume that every conceivable subject encompassed by "wages, hours and other terms and conditions of employment" is covered by a statutory provision specified in section 3517.6. As we shall explain below, where the parties fail to reach agreement on a subject *not* covered by one of the provisions specified in section 3517.6, DPA may impose its last, best offer.

be superseded by a MOU. By doing so, the Legislature has indicated that section 19826 takes effect in the absence of an agreement, precluding DPA from unilaterally adjusting represented employees' wages. As a consequence the question of represented employees' wages at impasse must ultimately be resolved by the Legislature itself.

This result is consistent with the structure of the Dills Act, which demonstrates the Legislature's intention to retain ultimate authority over state workers' employment conditions. Moreover, as we shall show, the legislative histories of section 19826 and of the Dills Act demonstrate that, particularly regarding wages, the Legislature intended to retain ultimate authority.

B

The legislative histories of the Dills Act and section 19826 are interrelated. Section 19826 traces its roots to former section 18850, which was initially applicable to the State Personnel Board (SPB). In 1934, the people adopted by initiative former article XXIV (now art. VII) of the California Constitution, which established the SPB with the mandate to establish and maintain a merit system of employment in the state service. (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 182-184 [172 Cal.Rptr. 487, 624 P.2d 1215].) The power to set salaries is legislative in nature. By enacting section 18850 in 1945, the Legislature delegated to the SPB the legislative salary-setting function. (29 Cal.3d at pp. 189-192; *State Trial Attorneys' Assn.* v. *State of California* (1976) 63 Cal.App.3d 298, 303 [133 Cal.Rptr. 712]; Stats. 1945, ch. 123, § 1, p. 549.)

But this delegation to the SPB was not total. As applicable from 1949 until 1977, section 18850 provided: "The [SPB] shall establish and adjust salary ranges for each class of position in the state civil service. The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities. In establishing or changing such ranges consideration shall be given to the prevailing rates for comparable service in other public employment and in private business. The [SPB] shall make no adjustments which require expenditures in excess of existing appropriations which may be used for salary increase purposes. The [SPB] may make a change in salary range retroactive to the date of application for such change." (Stats. 1949, ch. 252, § 1, pp. 474-475.) By limiting salary adjustments to existing appropriations, in the penultimate sentence of the section, the Legislature placed a limit on the SPB's delegated salary-setting authority.

The SPB's delegated authority to set salaries for state employees eventually gave way to pressures to establish salaries by negotiation. "The early

1970's brought an increasing demand among state employees for a formal system of collective bargaining that would provide them with a more meaningful role in establishing the terms and conditions of their employment. (See King, Deliver Us From Evil: A Public History of California's Civil Service System (1979) p. 51.) In response, Governor Reagan in March 1971 issued an executive order centralizing the 'meet and confer' process by designating one state official, chosen by the Governor, to be responsible for meeting and conferring with employee organizations for the purpose of reaching an agreement on salary and employee benefits (Exec. Order No. R-25-71.)[2] [Footnote 2: "In 1975, Governor Brown transferred these duties to a newly created Office of Employee Relations. (Exec. Order No. B-7-75.)"] [¶] In 1972, following the first major state employee strike, the Legislature created the Assembly Advisory Council on Public Employee Relations, chaired by UCLA Professor Benjamin Aaron, to formulate recommendations 'for establishing an appropriate framework within which disputes can be settled between public jurisdictions and their employees.' (Assem. Res. No. 51 (1972 Reg. Sess).) In its 1973 report the Advisory Council recommended the enactment of a comprehensive state law, modeled on the National Labor Relations Act, which would afford formal collective bargaining rights to all public employees." (*Pacific Legal Foundation* v. *Brown, supra*, 29 Cal.3d at pp. 176-177.)

Meanwhile, the SPB issued a position paper, discussing the relationship between its salary-setting role vis-à-vis collective negotiations to set salaries. "[T]he [SPB] itself has consistently concurred in the view that its constitutional authority to prescribe classifications does not encompass the ultimate authority to set civil service salaries. In a 1974 position paper, 'A Perspective on Collective Bargaining in the State Civil Service,' drafted by the [SPB] in response to the then-current legislative study of the issue, the [SPB] drew a sharp distinction between the classification power which it believed resided within its exclusive jurisdiction and should not be subject to negotiation, and the authority to set salaries which it concluded did not fall within its aegis and could properly be open to bargaining. Thus, with reference to salaries, the [SPB] proposed that '[s]alary and benefit negotiations should become a responsibility of the administration under collective bargaining. The [SPB] staff currently provides the expertise in this area and should continue to perform the staff work related to salary and benefit matters, but administratively responsible to the Governor's negotiator. Salary and benefit data collection and application would be performed in response to management's needs primarily with only minimal data published.' (*Id.,* at p. 11.)" (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at pp. 191-192.)

The SPB's position paper expressly addressed the question of the process after the parties reach impasse. "We propose a three-step impasse procedure

for resolving bargaining disputes, with either party initiating each step following a determination that an impasse exists. [¶] The first step is mediation by a third-party neutral; next is fact-finding with the fact-finder's recommendations made public if an agreement is not reached. . . . *The final step is identical to the present legislative process: Legislative review and determination of the items in dispute, subject to gubernatorial veto and subsequent legislative override.* There is ample evidence that this process can and will work in the event collective bargaining becomes a reality in State Government." (State Personnel Board, A Perspective on Collective Bargaining in the State Civil Service, (1974) at p. 10, italics added.)

"The Legislature, however, was unable to agree on a comprehensive bill covering all public employees and decided instead to draft separate collective bargaining statutes directed to the specific needs and problems of different categories of public entities. In line with this approach, the Legislature in 1975 first enacted the Educational Employment Relations Act (EERA) (Stats. 1975, ch. 961, § 2, p. 2247, codified in § 3540 et seq.); EERA repealed the Winton Act, established formal negotiating rights for public school employees, and created the Educational Employment Relations Board [now PERB], an expert, quasi-judicial administrative agency modeled after the National Labor Relations Board, to enforce the act. In 1977, the Legislature adopted [the Dills Act], . . . to provide formal collective bargaining rights to state employees. Finally, the legislative sequence was completed in 1978 with the adoption of the Higher Education Employer-Employee Relations Act (HEERA) (Stats. 1978, ch. 744, § 3, p. 2312, codified in § 3560 et seq.), granting similar rights to employees in the state university and University of California systems." (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 177.)

"*Although the [Dills Act] affords state employees significant new rights, the Legislature at the same time placed definite limits on the scope of representation and retained substantial control over state employee compensation and many other terms and conditions of state employment.*[16] [The Dills Act] specifically precludes bargaining over 'the merits, necessity, or organization

---

[16]The Dills Act provided new rights for state employees. "First, the act establishes the principle of exclusive representation on matters of employment relations by employee organizations chosen by a majority of employees in administratively designated bargaining units. (§§ 3520.5, 3521.) Second, the act requires the Governor and the exclusive employee representatives to meet and confer in good faith for the purpose of reaching agreement on wages, hours and other terms and conditions of state employment. (§ 3517.) Finally, the act specifically directs that any such agreement that the parties do reach be set forth in a written memorandum of understanding. (§ 3517.5.)" (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 178.)

of any service or activity provided by law or executive order.' (§ 3516.) The act also provides that as to matters within the scope of representation, a memorandum of understanding requiring the expenditure of funds does not become effective unless it is approved by the Legislature in the annual Budget Act (§ 3517.6); under this provision, virtually all salary agreements are subject to prior legislative approval. [¶] The act further provides that, except with respect to a number of specific statutes which the Legislature has expressly determined may be superseded by a memorandum of understanding, any provision of a memorandum of understanding in conflict with a statutory mandate shall not be effective unless approved by the Legislature. (*Ibid.*)" (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 178, italics added.)

Finally, the act requires that any agreement reached between the Governor and the exclusive representative shall be presented, when appropriate, to the Legislature for "determination" (§ 3517.5). Under the authority of sections 3517.5 and 3517.6, the Legislature has enacted statutes approving MOU's entered into between the state and state unions since the act's enactment. (See Historical and Statutory Notes, 32A West's Ann. Gov. Code, §§ 3517.5, 3517.6 (1991 pocket supp.) pp. 39-44.) Should the Legislature refuse to approve or fully fund any MOU provision requiring the expenditure of funds, either party may reopen negotiations regarding that provision. (§ 3517.7.)[17]

The same bill that created the Dills Act in 1977 enacted subdivision (b) of former section 18850, which was identical to current subdivision (b) of section 19826, except that it applied to the SPB rather than the DPA. (Stats. 1977, ch. 1159, § 8, pp. 3763-3764.) Thus, as to represented employees, the SPB no longer had salary-setting authority. The Legislature transferred that delegation to the Governor and the state unions. But, by numerous limitations in the Dills Act, the Legislature further limited the delegation of its salary-setting authority.

 This legislative history, as well as the structure of the Dills Act, supports the conclusion that, in the absence of agreement between DPA and the state unions regarding wages, the Legislature intended section 19826,

---

[17]That the Legislature intended to retain ultimate authority over state employees' wages, hours and working conditions is further demonstrated by the fact that, in its initial version, section 3532 of the act permitted the state and unions to reach "binding agreements," but this language was transferred to and amended in section 3517.5 to require submission of memoranda of understanding to the Legislature for approval. (Sen. Amend. to Sen. Bill No. 839 (1977-1978 Reg. Sess.) Apr. 25, 1987; Assem. Amend. to Sen. Bill No. 839 (1977-1978 Reg. Sess.) Aug. 31, 1977.)

subdivision (b), which expressly precludes DPA from establishing or adjusting the salaries of represented employees, would apply. Given that this statute denies DPA the power unilaterally to set salaries, the Legislature must have intended that unresolved wage disputes return to the Legislature for final determination. DPA contends this result absurdly abrogates months of bargaining between the parties and shuts out the Governor (i.e., DPA) from the process of establishing state salaries. But, given that DPA's and the unions' authority to set salaries derives from a legislative delegation, it is not at all absurd that the Legislature would reserve its authority to act in the event of a stubborn wage dispute. We note that in nearly a decade under the Dills Act, this is the first year a serious budget deficit has resulted in an impasse on wages. Considering also the highly political nature of this dispute, it makes further sense that it will be ultimately resolved in the political branch. Our conclusion is consistent with the Dills Act, which represents only a limited delegation of the Legislature's salary-setting function, and includes numerous provisions suggesting the Legislature intended to retain final determination of state salaries. Finally, DPA's contention the Governor is left out of the salary-setting process is obviously incorrect. The Governor retains his veto power over any subsequent wage legislation.

C

DPA finally contends the legislative history of section 19826 shows the Legislature intended that section to apply to DPA solely in the exercise of its salary-setting function, and not as the Governor's representative for collective bargaining. We reject this contention. To the contrary, amendments to the Dills Act and section 19826 made at the time of the creation of DPA further indicate the Legislature intended to resolve wage disputes at impasse.

Although former section 18850 was amended in 1977 to include subdivision (b), PERB did not hold the first elections for state employees' exclusive representatives until May 1981. (Governor's Off. of Employee Relations, OER Rep. (May 1981) vol. 1, No. 1, p. 1.) Because no exclusive representatives had yet been selected, the SPB continued in the interim to set salaries for all state employees. (See *California State Police Assn.* v. *State of California* (1981) 120 Cal.App.3d 674, 681 [175 Cal.Rptr. 34].)

The bill that enacted the Dills Act also amended the George Brown Act so that it no longer applied to civil service employees (Stats. 1977, ch. 1159, § 5, pp. 3760-3761).[18] At the same time, the bill provided for continued representation of civil service employees by their nonexclusive representatives (Stats. 1977, ch. 1159, § 4, pp. 3751-3753). During the period from 1977 to 1981 the nonexclusive representatives met and conferred with the Governor's Office of Employee Relations. (See *Professional Engineers in Cal. Government* v. *Department of Transportation* (1980) 114 Cal.App.3d 93, 97-99 [170 Cal.Rptr. 444].) But, until the election of exclusive representatives in 1981, this obligation to meet and confer did not include an obligation to meet and confer in good faith, i.e., to endeavor to reach agreement on matters within the scope of·representation. (§§ 3513, subd. (b), 3517.)

In his State of the State speech in January 1979, Governor Brown asked the Commission on California State Government Organization and Economy (Commission) to undertake a comprehensive review of the state's personnel system. The Commission issued its report, "Personnel Management in the State Service," (Personnel Management) in August 1979. The Commission suggested fundamental changes in the executive management structure should be made to meet the challenges posed by the Dills Act. (Com. Rep. (Aug. 1979) Personnel Management, at pp. i-ii, 6.) The Commission recommended the creation of DPA, empowered with, inter alia, the labor relations function of the Governor's Office of Employee Relations and the pay and benefits function of the SPB. (*Id.* at pp. 27-29.)

The Governor acted upon this recommendation of the Commission by transmitting to the Legislature the Governor's Reorganization Plan No. 1 of 1981 (reorganization plan). (Stats. 1981, appen., p. 103 et seq.; see also Governor's Message to Assem. on Governor's Reorganization Plan No. 1 of

---

[18]"In 1961, the evolution of public employee rights in this state began with the enactment of the George Brown Act (Stats. 1961, ch. 1964, § 1, pp. 4141-4142, now codified in §§ 3525-3536). As originally enacted, the act applied to employees of the state, cities, counties, school districts and institutions of higher education, granting such employees the right to join employee organizations of their choosing, and requiring public employers to 'meet and confer' with employee organizations prior to undertaking action on 'all matters relating to employment conditions and employer-employee relations.' [¶] Although it represented a significant first step, the George Brown Act omitted a number of key elements that have proven to be important factors in formulating peaceful labor relations in the private sector. Thus the act did not provide any mechanism for recognizing an employee organization as the exclusive representative of a group of employees, and placed no obligation on either the employer or employees to attempt to reach an agreement on terms and conditions of employment, i.e., to negotiate in good faith. Moreover, the act afforded the parties no explicit authority to reach binding agreements and did not establish an expert labor relations agency with authority to oversee the process and devise appropriate remedies for improper conduct by employees or employers." (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 176.)

1981 (Jan. 29, 1981) 1 Assem. J. (1981-1982 Reg. Sess.) pp. 399-402.) Under the Executive Reorganization Act (§ 12080 et seq.), either house of the Legislature could have prevented the reorganization plan from taking effect by passing a resolution disfavoring it within 60 days of the Governor's submission of the reorganization plan (§§ 12080, subd. (c), 12080.5). The reorganization plan took effect on May 1, 1981.[19]

In accordance with section 12081, the Legislature adopted a statute codifying the reorganization plan. (Stats. 1981, ch. 230, p. 1156 et seq.)[20] As relevant here, the reorganization plan transferred to DPA the SPB's salary-setting authority, by the repeal of former section 18850 and the reenactment of its provisions substantially verbatim in section 19826. Simultaneously, the reorganization plan transferred the Governor's labor relations function from the Governor's Office of Employee Relations to DPA by enacting section 19819.7, which provides as relevant: "Notwithstanding any other provisions of the law, it shall be the function of the [DPA's Division of Labor Relations] to represent the Governor regarding all the relevant provisions of law with respect to state employees found in Section 3517 [of the Dills Act] . . . . The duties of the Deputy Director of Labor Relations and the labor relations officers shall be limited to the department's professional functions and responsibilities in labor relations matters pursuant to [the Dills Act] . . . ." Accordingly, at the same moment DPA acquired the SPB's salary-setting function, DPA also became the Governor's representative for meeting and conferring in good faith under the Dills Act.

DPA argues the Legislature intended section 19826, subdivision (b) to apply to DPA solely in its salary-setting role. But there is no language in the reorganization plan or elsewhere to suggest subdivision (b) of section 19826 applies to DPA solely as salary-setter. DPA's position is further belied by the Legislature's approval of a plan providing simultaneously for the

---

[19]The reorganization plan provided it would take effect on the first payroll period after the California Supreme Court's decision in *Pacific Legal Foundation* v. *Brown*. (Stats. 1981, Appen., § 56, p. 228; see also § 12080.5.) The Supreme Court issued its opinion in that case on March 12, 1981. (*Pacific Legal Foundation* v. *Brown*, *supra*, 29 Cal.3d 168.)

[20]Section 12081 provides: "The Legislative Counsel shall prepare for introduction not later than the next regular session of the Legislature occurring more than 90 days after that in which a Governor's reorganization plan takes effect a bill effecting such changes in the statutes as may be necessary to reflect the changes made by the reorganization plan. [¶] The purpose of this section is to insure that statutory law is amended to conform with the changes made by the reorganization plan, but failure to enact such a bill shall not affect the validity of the plan."

DPA's roles as salary-setter and employer negotiator. The Legislature was obviously aware that subdivision (b) of section 19826 forbids DPA from adjusting salaries for represented employees; given that this limitation was placed on DPA contemporaneously with the assignment to DPA of the collective bargaining function, the Legislature must have intended the limitation to apply to both functions. Moreover, there in fact is no difference between DPA's salary-setting and negotiating roles with respect to represented employees. The sole mechanism for DPA to adjust state employees' salaries is via the meet-and-confer process.

DPA's argument is also belied by the language of section 19826, subdivision (d), which provides that MOU's may supersede the provisions of section 19826. Under that provision, it is possible that DPA and a state employee union could adopt language providing that DPA would set salaries for that union's represented employees. However, assuming the parties later negotiated on a new contract containing an identical provision and reached impasse over that provision, the language delegating DPA as salary-setter would no longer be operative with the expiration of the predecessor contract, ironically reinstating as controlling the language in section 19826, subdivision (b), which, by expressly precluding DPA from setting salaries, would resolve the impasse as to that provision.[21]

DPA's role as salary-setter cannot be divorced from its role as the employer's negotiator. As to represented employees, the roles are one and the same. Thus, when DPA bargains to impasse without reaching agreement on salaries, the Dills Act provides that section 19826 applies. Given that subdivision (b) of section 19826 expressly precludes DPA from adjusting salaries, the sole conclusion that can be drawn is that the Legislature intended postimpasse wage disputes to be resolved through the legislative process.

---

[21]In arguments before the respondent court, DPA claimed that in the period from 1977 to 1981, when the salary-setting function resided in the SPB and the Governor's labor relations function resided in a separate agency (the Office of Employee Relations), because former section 18850 applied solely to the SPB, there was no limitation on the Governor's ability to impose his last, best offer regarding wages at impasse. DPA contends this history further suggests that section 19826 was intended to apply to DPA solely as salary-setter. But DPA misreads the history. Because exclusive representatives were elected at the earliest in May 1981, there was never a time before that when the Governor's designated representative was required to bargain in good faith; thus, the Governor's representative would never have been in the position to impose its last, best offer at impasse. The legislative history suggests, to the contrary, that before any of the state unions acquired the power to bargain (or to force the Governor's representative to bargain) to impasse, legislation was adopted limiting the authority of the Governor's representative after impasse as to wages.

V

Left to be decided is whether DPA had authority at impasse to impose its last, best offer regarding the rates of employer contributions to health care premiums. The respondent court concluded that at impasse the parties were bound by the premium contribution rate set out in section 22825.1, subdivision (a), the so-called "100/90 formula," and further that urgency legislation enacting section 22825.15 did not repeal section 22825.1, but merely permitted the parties to attempt to negotiate the premium contribution rate; accordingly, in the absence of an agreement, respondent court concluded, the 100/90 formula applies.[22]

---

[22]Section 22825.1 provides:

"(a) Notwithstanding any other provision of this article, the employer's contribution, with respect to each state officer and employee or an annuitant who was in the employment or office including an academic position with a campus of the California State University or is a survivor of that person, shall be adjusted by the Legislature in the annual Budget Act. Annual adjustments of the dollar amounts therein shall be based upon the principle that the employer's contribution for each employee or annuitant shall be an amount equal to 100 percent of the weighted average of the health benefits plan premiums for employees or annuitants enrolled for self alone plus 90 percent of the weighted average of the additional premiums required for enrollment of family members in the four health benefits plans which have the largest number of enrollments during the fiscal year to which the formula applied. Notwithstanding any other provision of this section, the employer's contribution, with respect to each state employee annuitant identified by the board who lives where there is no available, competitive health maintenance organization and a fee for service health plan is the only option, shall be an amount equal to 90 percent of the PERS Care premium for employees and annuitants enrolled for self alone plus 90 percent of the PERS Care premium required for enrollment of family members for the 1989-90 fiscal year. Notwithstanding any other provision of law, any plan which is offered exclusively as part of any flexible benefits program shall not be included in the formula. There shall be only one such contribution with respect to all annuitants receiving allowances as survivors of the same employee or annuitant.

"The employer's contribution under this section for each employee shall commence on the effective date of his or her enrollment.

"The contribution of each employee and annuitant shall be the total cost per month of the benefit coverage afforded him or her under the plan or plans less the portion thereof to be contributed by the employer.

"(b) If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5 or Chapter 12 (commencing with Section 3560) of Division 4 of Title 1, the memorandum of understanding shall be controlling without further legislative action, except that if those provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act."

Section 22825.15 provides:

"(a) Notwithstanding Section 22825.1, the employer's contribution with respect to each excluded employee as defined by subdivision (b) of Section 3527 who is otherwise eligible shall be determined by the Department of Personnel Administration subject to the appropriation of funds by the Legislature in the Budget Act.

"(b) Notwithstanding Section 22825.1 or any other provision of law, the employer's contribution with respect to each state employee, as defined by subdivision (c) of Section

DPA contends the respondent court erred because the Legislature obviously intended section 22825.15 to supersede section 22825.1.[23] Moreover, DPA argues, by providing in section 22825.15 that premium contribution rates of represented employees "shall be determined through the collective bargaining process" the Legislature intended a complete delegation of its authority to determine premium contributions to the negotiating parties, and thus, to DPA if the parties bargained to impasse. We believe DPA has the better argument.

The issue ultimately turns on what the Legislature intended by the words "collective bargaining process" in subdivision (b) of section 22825.15. Although that term is not defined in section 22825.15 or in the Dills Act, section 22825.15, subdivision (b) expressly applies to employees subject to the collective bargaining process of the Dills Act. ▮▮▮ Thus, a threshold question is whether the "collective bargaining process" of the Dills Act includes the authority of DPA, as the Governor's designated representative, to impose its last, best offer. We believe that it does, under certain limited circumstances.

The collective bargaining process of the Dills Act contemplates that DPA will meet and confer in good faith with state employees' exclusive representatives in an endeavor to reach agreement on matters within the scope of representation. (§ 3517.) In the event the parties do not reach agreement, they may mutually agree on a mediator, or either party may request that PERB appoint a mediator. (§ 3518.) The mediator attempts to reconcile the parties' dispute through interpretation, suggestion and advice. (§ 3513, subd. (d).) If the parties are still at impasse after mediation, the many Government Code sections regulating wages, hours and other terms and conditions of employment specified in section 3517.6, which the parties' expired MOU may have superseded, take effect. As we have indicated, section 19826, subdivision (b) requires that as to wages the Legislature resolve the impasse.

But something else must be intended where either a term or condition of employment is not covered by a statutory provision, or where, as here, the relevant statutory provision simply consigns the parties to the "collective bargaining process." We agree with DPA that in the event the subject of

---

3513 who is otherwise eligible, shall be determined through the collective bargaining process subject to the appropriation of funds by the Legislature in the Budget Act." (Stats. 1991, ch. 83, § 41, eff. June 30, 1991.)

[23]Implicit in DPA's argument is a concession that in the postimpasse absence of a MOU, relevant provisions of the Government Code apply.

impasse is not determined by a statutory provision, the collective bargaining process contemplates that DPA may impose its last, best offer.

Under section 8(a)(5) of the NLRA (29 U.S.C. § 158(a)(5)), the employer's obligation is merely to bargain collectively with the representatives of his employees, which the NLRB and courts have interpreted as a duty to bargain in good faith. Accordingly, ". . . after bargaining to an impasse, that is, after good faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are reasonably comprehended within his pre-impasse proposals." (*Taft Broadcasting Co.* (1967) 163 NLRB 475, 478; *Labor Board* v. *Katz* (1962) 369 U.S. 736, 745, fn. 12 [8 L.Ed.2d 230, 237, 82 S.Ct. 1107].) "This freedom of action which the employer has after, but not before, impasse springs from the fact that having bargained in good faith to impasse, he has satisfied his statutory duty to determine working conditions, if possible, by agreement with his employees." (*Bi-Rite Foods, Inc.* (1964) 147 NLRB 59, 65; see generally, Morris, The Developing Labor Law (2d ed. 1983) p. 636.)

We have previously held, in a case arising under the MMBA, that a local government employer commits an unfair practice by unilaterally changing wages, hours or working conditions prior to bargaining to impasse. (*San Joaquin County Employees Assn.* v. *City of Stockton* (1984) 161 Cal.App.3d 813, 819 [207 Cal.Rptr. 876].) There, the MOU required the city to pay premiums necessary to maintain the same health benefit levels during the life of the agreement. After the MOU expired, but before the parties had bargained to impasse, the insurance carrier increased the health benefit premiums. The city refused to pay the increased costs during the pendency of negotiations. (161 Cal.App.3d at p. 817.) Because section 3505 of the MMBA serves the same purpose as section 8(a)(5) of the NLRA, "to require an employer to negotiate with employees before implementing decisions that are properly the subject of bargaining" (161 Cal.App.3d at p. 819), we turned to NLRA precedent for "enlightenment" in our interpretation of the MMBA. Under the NLRA, ". . . after the expiration of a collective bargaining agreement, the duty to bargain collectively requires the employer to maintain the status quo without taking unilateral action as to wages, working conditions, or benefits until negotiations reach impasse. [Citations.] The status quo is measured by reference to the expired agreement itself. [Citation.] As the court said in *Peerless Roofing Co., Ltd.* v. *N.L.R.B.* [(9th Cir. 1981) 641 F.2d 734] 'the collective bargaining agreement itself survives its expiration date for some purposes.' (641 F.2d at p. 736.) Thus, during negotiations prior to impasse an employer may not unilaterally change insurance benefits specified in an expired agreement. [Citation.]" (*San*

*Joaquin County Employees Assn.* v. *City of Stockton, supra,* 161 Cal.App.3d at pp. 818-819.) Although undecided in *San Joaquin,* it is implicit in our decision that, after negotiating to impasse, the local public employer may impose its last, best offer.

Indeed PERB has ruled under the EERA that a school district employer may impose its last, best offer after bargaining in good faith to impasse, relying on NLRA precedent. (*Charter Oak Educators Assn.* v. *Charter Oak Unified School Dist.* (Apr. 4, 1991) PERB Dec. No. 873, at pp. 13-14; *Modesto City Schools* v. *Modesto Teachers Assn.* (Mar. 8, 1983) PERB Dec. No. 291, at pp. 33-38 [PERC 7 ¶ 14090, at pp. 351-352].) The school district employer's obligation to meet and negotiate in good faith under the EERA is similar to the public employers' obligations under the MMBA and the Dills Act to meet and confer in good faith. (Cf. §§ 3540.1, subd. (h), 3543.5, subd. (c) of the EERA with § 3505 of the MMBA and § 3517 of the Dills Act.)

To paraphrase our decision in *San Joaquin County Employees Assn.* v. *City of Stockton, supra,* 161 Cal.App.3d at p. 819, because section 3517 of the Dills Act is virtually identical to section 3505 of the MMBA, and both provisions serve the same purposes as section 3543.5, subdivision (c) of the EERA and section 8(a)(5) of the NLRA, we may turn to federal decisions regarding impasse for guidance in our construction of the Dills Act. (See also *Sullivan* v. *State Bd. of Control* (1985) 176 Cal.App.3d 1059, 1064 [225 Cal.Rptr. 454] [NLRA precedent may provide guidance in interpretation of the Dills Act].)

However, as we have previously explained, the Dills Act, unlike the MMBA and EERA, operates by supersession. Thus, unlike these state labor statutes, and also unlike the NLRA, the Dills Act in part determines what occurs at impasse. Under section 3517.6 of the Dills Act, more than one hundred Government Code provisions relating to state employees' wages, hours and working conditions, no longer superseded, take effect. But, with respect to a matter not covered by a dormant Government Code provision, we believe, consistent with cognate principles of federal labor law, DPA may at impasse impose its last, best offer.

The question remains whether the Legislature, in using the expression "collective bargaining process" in subdivision (b) of section 22825.15 had in mind DPA's imposition of its last, best offer at impasse. The legislative history of section 22825.15 demonstrates the Legislature did have this in mind.

Prior to the enactment of section 22825.15, the provisions of section 22825.1 set out two methods to determine the state's contribution for annual

health care premium rate increases for state employees represented by an exclusive representative. In accordance with subdivision (a) of section 22825.1, the state and the exclusive representative could permit the Legislature to adjust the contribution rates in the annual budget act, subject to the "principle" described as the 100/90 formula. Or, in accordance with subdivision (b) of section 22825.1, the parties could negotiate contribution rates in conflict with subdivision (a), but any such conflicting MOU provisions requiring the expenditure of funds would not become effective unless approved by the Legislature in the annual budget act. Either way, health premium contribution rates were controlled by the Legislature, either through an appropriation of a specific amount for the increases, or through express approval of conflicting MOU provisions providing for contribution rates.

The Legislature passed section 22825.15 during the height of the 1991-1992 budget crisis and sent it to the Governor on June 30, 1991 (Assem. Bill No. 702, Assem. Recess Hist., Oct. 18, 1991 (1991-1992 Reg. Sess.) p. 402; Stats. 1991, ch. 83, § 41, p. 14) before sending the Budget Act of 1991 to the Governor on July 3, 1991 (Assem. Bill No. 222, Assem. Recess Hist., Oct. 18, 1991 (1991-1992 Reg. Sess.) p. 143). Section 22825.15 was enacted as urgency legislation, effective June 30, 1991. The Legislature provided: "This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting the necessity are: [¶] The projected shortfall between General Fund revenues and expenditures of $14.3 billion for the 1991-92 fiscal year constitutes a genuine fiscal emergency, therefore this act must take effect immediately in order to ensure the continuation of essential governmental services." (Stats. 1991, ch. 83, § 43, No. 3 Deering's Adv. Legis. Service, p. 284.)

While in section 22825.1 the Legislature had expressly retained authority to determine the amount of employer contributions for premium rate increases, section 22825.15 represents an almost total delegation of this authority to DPA and the state unions. As to excluded employees, those not covered by the Dills Act, subdivision (a) of section 22825.15 provides, "[n]otwithstanding Section 22825.1," DPA shall determine the contribution rates. As to state employees covered by the Dills Act, subdivision (b) provides, "[n]otwithstanding Section 22825.1 or any other provision of law," the contribution rates shall be determined "through the collective bargaining process." In both cases, the Legislature has retained authority over the employer's premium contributions only by providing such increases may not exceed the total funds appropriated (i.e., by inclusion of the language,

"subject to the appropriation of funds by the Legislature in the Budget Act"). This considerable delegation of legislative authority suggests the Legislature intended that the issue of health premium contribution rates would be resolved by DPA, through negotiations, if possible, but failing that, through unilateral action.

■ The respondent superior court attempted to harmonize section 22825.1 with section 22825.15, subdivision (b) by suggesting the Legislature intended the latter provision to permit the parties to negotiate regarding contribution rates, but failing agreement, the provisions of the former statute would apply. Similarly, real parties in interest contend the latter provision merely directs the parties to try to reach agreement regarding contribution rates, rather than allowing the rates to be adjusted by the Legislature in the budget act; but, because the Legislature did not expressly repeal the former statute, the Legislature further intended that, failing agreement, the provisions of the former statute would apply.

■ "When a later statute supersedes or substantially modifies an earlier law but without expressly referring to it, the earlier law is repealed or partially repealed by implication. The courts assume that in enacting a statute the Legislature was aware of existing, related laws and intended to maintain a consistent body of statutes. [Citations.] Thus there is a presumption against repeals by implication; they will occur only where the two acts are so inconsistent that there is no possibility of concurrent operation, or where the later provision gives undebatable evidence of an intent to supersede the earlier; the courts are bound to maintain the integrity of both statutes if they may stand together. [Citations.]" (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 54 [69 Cal.Rptr. 480].) ■ In *Sacramento Newspaper Guild*, we noted that a statute declaring its application " 'notwithstanding the conflicting provisions of any other state law' " repeals existing statutes only to the extent the two laws are irreconcilable. "Failing to designate what if any laws are superseded, such a clause has no greater force than a repeal by implication. . . ." (*Id.* at p. 55.)

■ Moreover, where a newly enacted statute revises the entire subject matter of an existing statute, the later statute may be said to repeal the earlier statute by implication. "In order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first. [¶] The presumption is against repeals by implication, especially where the prior act has been generally understood and acted upon. To overcome the presumption

the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together. Where a modification will suffice, a repeal will not be presumed. [Citations.]" (*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176 [74 P.2d 252].)

In this case, section 22825.15 contains undebatable evidence the Legislature intended it to supersede the provisions of section 22825.1 which refer to the manner by which contribution rates are determined. First, of course, section 22825.15, subdivision (b) provides that it applies "notwithstanding section 22825.1." This statement expressly indicates the Legislature's intent to supersede the earlier statute to the extent it is inconsistent.

In addition, section 22825.15 covers much of the same subject matter covered by section 22825.1. To the extent the statutes address the process of determining contribution rates, they may not be reconciled in a rational manner. As to subdivision (a) of section 22825.15, it is patent that both the Legislature and DPA cannot determine the contribution rates for excluded employees. As to subdivision (b), the contribution rates for represented employees cannot be approved both by the Legislature in the budget act and "determined" through the collective bargaining process. The respondent court's attempt to harmonize the two statutes, by reading subdivision (b) of section 22825.15 as merely permitting the parties to negotiate, renders that subdivision simply repetitive of section 22825.1 and therefore nugatory. The attempt of real parties in interest to harmonize the statutes by reading subdivision (b) of section 22825.15 as directory but having the 100/90 formula of section 22825.1 apply in the absence of an agreement, achieves a result inconsistent with the legislative history which indicates the Legislature intended a complete delegation of authority over the contribution rates to the negotiating parties. The result is also absurd. Given that section 22825.15 was enacted as urgency legislation to address the $14 billion budget shortfall, it is inconceivable the Legislature intended to have the parties engage in collective bargaining only to have the most favorable 100/90 formula apply in the absence of an agreement.

Moreover, the fact that subdivision (a) of section 22825.15 indisputably repeals section 22825.1 as to the process for determining contribution rates of excluded employees provides additional evidence the Legislature also intended subdivision (b) of section 22825.15 to repeal section 22825.1 as to that process for represented employees. And, finally, the comprehensiveness of section 22825.15 in respect to the subject matter of section 22825.1

dealing with the procedure for setting contribution rates convinces us the later provision was intended to substitute for the earlier as to this procedure. The two provisions may "stand together" only to the extent section 22825.1 describes the 100/90 formula as a "principle" for the determination of contribution rates, and in the miscellaneous provisions of section 22825.1 which do not set out the procedure for determining the contribution rates, such as the requirement that the employee must pay the difference between the employer's contribution and the total cost per month of the benefit coverage.

Because we conclude respondent superior court erred in its ruling with respect to the authority of DPA to impose its last, best offer as to the employer's contribution to health premium cost increases, we shall issue a peremptory writ.

## VI

A peremptory writ of mandate will issue directing the respondent superior court to vacate that portion of its judgment issuing a peremptory writ of mandate ordering the Department of Personnel Administration, David Tirapelle and the State Controller to desist and refrain from modifying the health care premium payment formula for state employees. In all other respects the petition for writ of mandate is denied. The alternative writ previously issued has served its purpose and is discharged. Each party will bear its own costs.

Sims, J., and Raye, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied June 25, 1992. Mosk, J., was of the opinion that the petition should be granted.